UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

           - v. -

FARHAD SHAKERI,
CARLISLE RIVERA,
  a/k/a "Pop," and
JONATHAN LOADHOLT,

                    Defendants.

24 Cr. 670 (LJL)

---

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' PRETRIAL MOTIONS**

 

JAY CLAYTON
United States Attorney for the
Southern District of New York

Jacob H. Gutwillig
Michael D. Lockard
Assistant United States Attorneys

Julie Isaacson
Special Assistant United States Attorney

*Of Counsel*

**TABLE OF CONTENTS**

Page

FACTUAL BACKGROUND .........................................................................................................2

    A.    Farhad Shakeri Pays Rivera and Loadholt to Target Victim-1 at Fairfield University ................................................................................... 3

    B.    Rivera and Loadholt Stake Out Victim-1's Former Residence ............................ 4

    C.    Shakeri Prepares $100,000 to Deliver to Rivera if Rivera and Loadholt "Finish the Work" ..................................................................................... 6

    D.    Shakeri, Rivera, and Loadholt Discuss the $100,000 Payment to "Take Care of It Already"........................................................................ 7

    E.    Rivera and Loadholt Are Arrested ........................................................... 9

    F.    Rivera's Post-Arrest Interview ................................................................. 9

ARGUMENT ................................................................................................................... 13

    I.    Rivera's Motion to Suppress His Post-Arrest Statements Should Be Denied ...... 13

        A.    Applicable Law ..................................................................... 13

        B.    Discussion ............................................................................. 16

    II.    Loadholt's Motion for Severance Should Be Denied ........................................ 22

        A.    Applicable Law ..................................................................... 22

        B.    Discussion ............................................................................. 25

    III.    The Defendants' Motion to Dismiss the Indictment for Purported Failure to Allege Proper Venue in this District Should Be Denied....................................... 28

        A.    Applicable Law ..................................................................... 28

        B.    Discussion ............................................................................. 30

CONCLUSION............................................................................................................... 32

## TABLE OF AUTHORITIES

Page

**Cases**

*Berghuis v. Thompkins*, 560 U.S. 370 (2010) ........................................................................ 14, 15

*Bruton v. United States*, 391 U.S. 123 (1968) ....................................................................... 2, 23, 24

*Campaneria v. Reid*, 891 F.2d 1014 (2d Cir. 1989) ..................................................................... 16

*Colorado v. Connelly*, 479 U.S. 157 (1986) ................................................................................ 15

*Costello v. United States*, 350 U.S. 359 (1956) ............................................................................ 29

*Davis v. United States*, 512 U.S. 452 (1994) ............................................................................... 14

*Edwards v. Arizona*, 451 U.S. 477 (1981) .................................................................................... 20

*Haynes v. Washington*, 373 U.S. 503 (1963) ................................................................................ 15

*Lynumn v. Illinois*, 372 U.S. 528 (1963) ..................................................................................... 15

*Michigan v. Mosley*, 423 U.S. 96 (1975) ................................................................................ 14, 16

*Miranda v. Arizona,* 384 U.S. 436 (1966) ............................................................................. passim

*Oregon v. Bradshaw*, 462 U.S. 1039 (1983) ........................................................................... 16, 22

*Oregon v. Elstad*, 470 U.S. 298 (1985) ....................................................................................... 15

*Richardson v. Capra*, 2024 WL 2161008 (2d Cir. 2024) .......................................................... 17, 22

*Richardson v. Marsh*, 481 U.S. 200 (1987) ............................................................................ 24, 25

*State v. Valdez*, 552 P. 3d 159, 168 (Utah 2023) ......................................................................... 19

*United States* v. *Alfonso*, 143 F.3d 772 (2d Cir. 1998) ................................................................. 29

*United States v. Amirov, et al.*, 22 Cr. 438 (CM) ........................................................................... 3

*United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991) ................................................................ 16

*United States v. Asch*, 775 F. App'x 15 (2d Cir. 2019) ................................................................. 23

*United States v. Benitez*, 920 F.2d 1080 (2d Cir. 1990) ................................................................ 25

*United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989) ........................................................... 23

*United States v. Collins*, 462 F.2d 792 (2d Cir. 1972)............................................................... 16, 22

*United States* v. *De La Pava*, 268 F.3d 157 (2d Cir. 2001).............................................................. 29

*United States* v. *Dell'Aria*, 811 F Supp. 837 (E.D.N.Y. 1993) ....................................................... 16

*United States* v. *Elson*, 968 F. Supp. 900 (S.D.N.Y. 1997)............................................................ 29

*United States v. Ephron*, 2025 WL 524027 (S.D.N.Y. 2025)......................................................... 20

*United States v. Fama*, 1996 WL 438165 (S.D.N.Y. 1996) ........................................................... 31

*United States v. Farahani et al.*, 21 Cr. 430 (RA) ........................................................................... 3

*United States* v. *Goldberg*, 756 F.2d 949 (2d Cir. 1985).................................................................. 30

*United States v. Gonzalez-Garcia*, 708 F.3d 682 (5th Cir. 2013).................................................... 20

*United States v. Jass,* 569 F.3d 47 (2d Cir. 2009) .......................................................................... 25

*United States v. Jaswal*, 47 F.3d 539 (2d Cir. 1995) ...................................................................... 15

*United States v. Kirk Tang Yuk*, 885 F.3d 57 (2d Cir. 2018)........................................................... 32

*United States v. Korolkov*, 870 F. Supp. 60 (S.D.N.Y. 1994)......................................................... 30

*United States v. Lyle*, 919 F.3d 716 (2d Cir. 2019) ................................................................... 25, 26

*United States v. Oehne*, 698 F.3d 119 (2d Cir. 2012)................................................................. 17, 22

*United States* v. *Patane*, 542 U.S. 630 (2004) ........................................................................... 14, 19

*United States* v. *Perez*, 575 F.3d 164 (2d Cir. 2009)................................................................... 29, 30

*United States* v. *Piper*, 2012 WL 4757696 (D. Vt. 2012)............................................................... 29

*United States v. Pirro*, 76 F. Supp.2d 478 (S.D.N.Y. 1999)........................................................... 23

*United States v. Plugh*, 648 F.3d 118 (2d Cir. 2011)................................................................. 14, 15

*United States v. Ramirez-Amaya*, 812 F.2d 813 (2d Cir. 1987)....................................................... 32

*United States v. Riley*, 2014 WL 53440 (S.D.N.Y. 2014) .............................................................. 31

iii

*United States v. Rogers*, 1991 WL 90797 (S.D.N.Y. 1991) ..................................................... 30, 31

*United States v. Rosa,* 11 F.3d 315 (2d Cir. 1993) .......................................................... 24

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) ................................................... 23, 27

*United States v. Sampson*, 385 F.3d 183 (2d Cir. 2004).............................................. 23, 27

*United States* v. *Sharpe*, 438 F.3d 1257 (11th Cir. 2006)................................................... 29

*United States v. Shvartsman*, 722 F. Supp. 3d 276, 320 (S.D.N.Y. 2024)..................................... 19

*United States v. Slocum,* 695 F.2d 650 (2d Cir. 1982) ...................................................... 24

*United States v. Spencer*, 995 F.2d 11 (2d Cir. 1993) ...................................................... 15

*United States* v. *Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) .......................................... 30

*United States v. Stein*, 429 F. Supp. 2d 633 (S.D.N.Y. 2006) ......................................... 30

*United States v. Szur*, 1998 WL 132942 (S.D.N.Y. 1998) ................................................. 31

*United States v. Taylor*, 745 F.3d 15 (2d Cir. 2014)...................................................... 15

*United States v. Tutino,* 883 F.2d 1125 (2d Cir. 1989) ................................................... 25

*United States v. Van Hise*, 2017 WL 3425750 (S.D.N.Y. 2017) ....................................... 23, 25, 26

*United States v. Vanhise*, 797 F. App'x 618 (2d Cir. 2020)............................................. 23

*United States* v. *Walsh*, 194 F.3d 37 (2d Cir. 1999). ................................................... 29

*United States v. Williams*, 936 F.2d 698 (2d Cir. 1991) ................................................. 25

*United States v. Wimbley*, 18 F. App'x 24 (2d Cir. 2001) ............................................... 26

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003)...................................................... 25

*Zafiro v. United States*, 506 U.S. 534 (1993)................................................... 23, 24, 26

**Statutes**

18 U.S.C. § 3238................................................................................ 1, 31

## Rules

Federal Rule of Crimianl Procedure 7(c)(1) ................................................................................. 30

Federal Rule of Criminal Procedure 14 ........................................................................................ 23

Federal Rule of Criminal Procedure 29 .......................................................................... 29, 30, 32

The Government respectfully opposes the pretrial motions filed by defendants Carlisle Rivera, a/k/a "Pop," and Jonathan Loadholt.  Rivera moves to dismiss Indictment 24 Cr. 670 (LJL) (Dkt. 4, the "Indictment"), alleging improper venue in this District.  (*See* Dkt. 24 ("Rivera Motion")).  Rivera further moves to suppress statements he made in a voluntary, *Mirandized* post-arrest interview and requests an evidentiary hearing.  *Id*.  Loadholt joins Rivera's motion to dismiss the Indictment, also alleging improper venue, and also moves for a severance from Rivera.  (*See* Dkt. 22 ("Loadholt Motion")).

The defendants' motions should be denied in their entirety.  As discussed more fully below:

(1)      Venue is properly alleged in the Indictment, precluding the motion to dismiss. Contrary to the defendants' incorrect assertions, the Indictment alleges that the relevant offenses occurred "in . . . the Southern District of New York, and elsewhere," and alleges as an alternative basis for venue 18 U.S.C. § 3238 (an alternative basis that the Government does not anticipate relying on as to these two defendants).  The venue allegation must be taken as true at this stage of the proceedings.  Moreover, the Government will offer evidence showing that the defendants travelled through this District in the course of committing the offense conduct. This evidence, as described in further detail below, also is clearly set forth in the detailed underlying criminal complaint (*see* Dkt. 1 (the "Complaint")).

(2)      Rivera's statements should not be suppressed, and no hearing is warranted because Rivera's post-arrest interview was video recorded.  That recording unambiguously shows that Rivera never invoked his right to counsel.  Rather, at one point, he expressed his desire to remain silent, which does not prohibit agents from continuing questioning when that right is scrupulously observed by law enforcement agents—which it was here—and the defendant himself re-initiates conversation about the case—which Rivera did.

(3)    Loadholt should not be severed from his co-defendant.  Rivera's statements during his post-arrest interview can be introduced as evidence against him at a joint trial consistent with the requirements of *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny.

## FACTUAL BACKGROUND[1]

Between at least approximately February and November 2024, the defendants—Rivera and Loadholt, along with their third co-defendant, Farhad Shakeri—were hired to murder an Iranian-American journalist, author, political activist, and outspoken critic of the Iranian regime's human rights abuses and corruption ("Victim-1").  Victim-1 has long been a high-priority target of the Iranian regime, and has been the target of prior kidnapping and murder plots directed and paid for by the regime.

Victim-1's murder was sought by the Government of Iran's Islamic Revolutionary Guard Corps's ("IRGC") Qods Force ("IRGC-QF").  The IRGC is a military and intelligence organization under the control of Iran's Supreme Leader, the Ayatollah Ali Khamenei.  Unlike a conventional military dedicated to the defense of a nation's territory, the IRGC is dedicated to the defense and spread of the Islamic Revolution, particularly targeting enemies and perceived enemies of the regime.  The IRGC-QF is a specialized component of the IRGC that is the regime's primary arm for executing its policy of supporting terrorist and insurgent groups, including by providing material, logistical assistance, training and financial support to militants and terrorist operatives throughout the Middle East and South Asia, including Hamas, Palestinian Islamic Jihad, and Hizballah, among other terrorist organizations.  The IRGC-QF has also orchestrated kidnapping and murder plots targeting Iranian dissidents and Israeli and Jewish individuals throughout the world.

---

[1] The Complaint contains a detailed recitation of the relevant factual background, which is summarized here.

2

The murder tasking was conveyed to Rivera by his long-time friend Shakeri, a former resident of New York with whom Rivera served prison time in the New York State correctional system. Following his prison sentence, Shakeri was deported from the United States and eventually lived in Iran, where he was tasked by the IRGC-QF with using his international network of criminal associates both to identify targets of attack and to organize attack teams targeting particular individuals of interest to the regime. One of the regime's main targets is Victim-1.

## A.  Farhad Shakeri Pays Rivera and Loadholt to Target Victim-1 at Fairfield University

In approximately December 2023 and January 2024, Shakeri paid another criminal associate ("CC-1"), with whom Shakeri had also spent time together while in New York State prison, to locate the house where Victim-1 was believed to live in Brooklyn[2] and surveil it. Shortly afterwards, Shakeri paid Rivera, who in turn enlisted his friend Loadholt, to target Victim-1.

Shakeri provided the defendants with a picture of Victim-1 and the date and time of a public speaking event that Victim-1 was scheduled to participate in at Fairfield University in Connecticut on February 15, 2024. Shakeri also sent Rivera approximately $1,000 through Western Union, using payment intermediaries in the United Arab Emirates and elsewhere. Using Loadholt's car, Rivera and Loadholt drove to Fairfield University on February 15, but the event was cancelled. The two men photographed themselves on the Fairfield University grounds and Rivera sent those pictures to Shakeri.

---

[2] Victim-1 and members of Victim-1's family lived at this house in Brooklyn (the "Brooklyn Residence") at the time of earlier plots directed by the Government of Iran between approximately 2019 and 2022. *See United States v. Farahani et al.*, 21 Cr. 430 (RA); *United States v. Amirov, et al.*, 22 Cr. 438 (CM). The Brooklyn Residence is also depicted in images and videos on Victim-1's social media accounts and in documentary films about Victim-1.

### B.    Rivera and Loadholt Stake Out Victim-1's Former Residence

Though Rivera and Loadholt missed the opportunity to carry out their tasking as to Victim-1 at Fairfield University, they continued targeting Victim-1, hoping to catch Victim-1 at the Brooklyn Residence where Victim-1 was believed to live.  In March 2024, Shakeri sent Rivera another approximately $2,600.  Multiple times that month, Rivera and Loadholt drove Loadholt's car from Staten Island, across the Verrazano-Narrows Bridge—which is part of this District—to Brooklyn to stake out the Brooklyn Residence, sometimes for hours at a time.  Rivera and Loadholt used elaborate methods to conceal their activities: they changed out the license plates on Loadholt's car before arriving at the Brooklyn Residence and after leaving it to prevent the stakeout activity from being associated with the two men; they turned off their regular cellphones or left them at home in order to prevent an electronic record of their travels; and they used a "burner" cellphone while on their stakeouts so they could communicate with Shakeri.  During one of their stakeouts on March 31, 2024, Rivera and Loadholt left Loadholt's car near the Brooklyn Residence and walked to a nearby bagel shop for food and coffee.  The two men did not give their real names for their orders and paid cash in order to avoid leaving a record of their presence there.

Rivera and Loadholt never saw Victim-1 during their stakeouts in March.  On April 1, 2024, Rivera and Shakeri exchanged a series of voice notes airing their frustrations—Shakeri at Rivera's and Loadholt's failure to accomplish the job, and Rivera at the difficulty of finding Victim-1 and at Shakeri's failure to pay the defendants more money.  They also discussed how to carry the job out, ruling out a home invasion because of the risks and agreeing that the job would have to be done while Victim-1 was out in public.  For example:

i.    In a voice note to Shakeri, Rivera stated, among other things, "this bitch is hard to catch, bro.  And because she hard to catch, there ain't gonna be no simple pull up, unless there the luck of the draw.  Unless there's the luck of the draw."

4

ii. In a voice note from Shakeri to Rivera on April 1, 2024, Shakeri told Rivera that Victim-1 spent most of the time in a study on the third floor and a recording studio on the second floor.[3]  Shakeri went on to state, among other things, that "you just gotta have patience and don't, kicking, kick in the door is not an option because that's a fail, that's a fail maneuver.  You gotta wait and have patience to catch her either going in the house or coming out, or following her out somewhere and taking care of it.  Don't think about going in. In is a suicide move."

iii. In a subsequent voice note, Rivera stated, among other things, that "we was here at night time, like 5:30 this morning, there was no fuckin' lights on. . . .  I already know kickin' in doors only gonna to bring more attention.  We already know that, that part.  That neighborhood is too quiet for that type of shit.  Unless she's on the first floor, and you kick that shit in and then, then, you know, and let's assume you kick it in on the first try."

iv. In a subsequent voice note, Rivera stated, "If we can catch her walking through the door, that's something different.  Getting' out the car, that's easy.  Kickin' the fuckin' door in?  That ain't gonna work, bro.  That ain't gonna work.  Kickin' the door in's not gonna work."

v. In a subsequent voice note, apparently responding to a message from Shakeri, Rivera stated:

> What I'm sayin' to you in a nutshell, bro, is in order for this to get done?  And I don't give a fuck who is [U/I].  You say, "fuck you, nigga, I want somebody else."  Ok, your secret safe with me 'cause I ain't no snitch nigga, and I sure ain't no bitch nigga.  So I can handle that, right.

Rivera thus assured Shakeri that if Shakeri decided to give the murder-for-hire job to someone else, Rivera would not inform on Shakeri.  Rivera continued:

> By the same token, you not gonna find too many motherfuckers who willing to take the job with receiving next to nothin' to start the job off with.  You sent me thirty-one fifty, right?  That pays for some tools and fuels, right?  Tools and fuels that's being, the slammer, mostly, the slammer.  Um, toll bridge fee, going back and forth.  Putting gas in the car.  Rentin' the car.  Look, the car ain't mine bromie, that shit is bein' rented.  It's funded by the thirty-one fifty.  Shit ain't, know what I mean, niggas ain't just lettin' you hold their car to do a drive by for nothin', know what I mean, so. . . .

---

[3] Among other things, Victim-1 recorded a Farsi-language news and satire program for Voice of America, which was sometimes recorded in part from home, as were other videos and interviews broadcast on Victim-1's social media.

Rivera's reference to a "tool," which he called a "slammer," means a firearm. In this voice note, Rivera informed Shakeri, among other things, that Rivera and Loadholt had used $3,150 received by Rivera from Shakeri to buy a firearm, to pay travel costs, and to pay for the use of the car intended to be used in a "drive by," or a drive-by shooting.

> But homie, how long you think that's gonna last? How long can you expect two workin' niggas, or one workin' nigga, really me, but my man too, he a workin' nigga too. He not like, he's gonna sit out here all night, all day, rain, cold, sleet, on a promise. Let's be for real, we out here on a promise, from a nigga I know. Not even a nigga he knows, a nigga I know. But the less he knows, the better off you are. The less you know, the better off he is. Only thing y'all knew each other is through me.
>
> So, how far, realistically speaking, how far can a, will a nigga move, or how much will a nigga move on a promise? Niggas be like nah, I don't give a fuck how I know you, nah I ain't riskin' that. And he ask me, he said yo, how you feel about, how I feel about you. I say "yo, he's always been good people with me. He's always had good character to me. . . . If it was anybody else I'd say get the fuck out my face. Because it's him, and I know it's him, I'm tempted to believe him. I'm willing to give it a try for him."

Rivera thus informed Shakeri that Rivera was willing to carry out the murder, including the repeated surveillance of the Brooklyn Residence the job had required, without a larger up-front payment because of Rivera's trust in Shakeri. Rivera persuaded Loadholt to do the same based on Rivera's vouching for Shakeri, even though Rivera was also protecting Shakeri by not revealing his identity to Loadholt and, conversely, protecting Loadholt by not revealing his identity to Shakeri.

### C.    Shakeri Prepares $100,000 to Deliver to Rivera if Rivera and Loadholt "Finish the Work"

In April 2024, Shakeri and Rivera discussed an additional payment of approximately $100,000 for Rivera and Loadholt to "finish the work." On or about April 19, 2024, Rivera

6

messaged Shakeri to ask, "Are we still on? Is that a green light?" Shakeri later messaged Rivera that "I haven't talked to my man, I'm still travelling[.] The 100k is still there[.]"

Rivera and Shakeri exchanged a series of messages about using a token to arrange Rivera's collection of the $100,000. On April 19, 2024, after Shakeri told Rivera that the $100,00 was still there, Rivera responded that "I don't even have that dollar bill I sent u the pick [sic] of[.]" The serial number of a particular dollar bill is frequently used as an authentication device in money laundering transactions or bulk cash deliveries to ensure that the intended person receives the money. Shakeri then asked Rivera to send "another bill" on the "the other math," using "math" as slang for a phone number. (Shakeri used multiple phone numbers). Neither Shakeri nor Rivera had cash on them, however, so Rivera sent a photograph of a book showing its ISBN number and asked Shakeri to use that number.

Shakeri confirmed the ISBN number, and then told Rivera to "Finish the work, and pick up[.]" Rivera answered, "Nigga I wish it was that easy but I ain't no quitter[.]" Shakeri later received a video of the Brooklyn Residence from "CR" and dated April 28, 2024, at approximately 6:11 p.m., confirming that Rivera and Loadholt returned to the house to attempt to kill Victim-1.

**D.    Shakeri, Rivera, and Loadholt Discuss the $100,000 Payment to "Take Care of It Already"**

By July, Shakeri again discussed the payment of $100,000 for Rivera to "take care of it already." Rivera pressed Shakeri for the payment, writing, "What are we doing nigga? Waiting on u[.]" Shakeri responded that he had "just renewed the 100K," referencing the $100,000 Shakeri had previously offered Rivera to "finish the work," meaning to kill Victim-1. Shakeri then explained that he had "Been traveling" and his "schedule is hectic," before sending Rivera an apparently close-range image of Victim-1 in workout attire lifting weights in a gym. He followed

up, writing to Rivera, "I wish you can take care of it already," and "Just do it son, I'll handle the rest."

After these communications between Shakeri and Rivera, on or about July 16, 2024, at approximately 2:59 a.m., Rivera sent Loadholt two screenshots, containing the text message conversations between Rivera and Shakeri. The two then discussed between themselves payment for the murder plot. Immediately after sending the text message screenshots, Rivera asked Loadholt, "Got it?" After seeking additional clarification, Loadholt asked, "So no 10 up front I'm guessing??" conveying his understanding that the two would not receive $10,000 up front to complete the job. Loadholt then expressed his dissatisfaction about not being paid, writing, "Yo wtf [what the fuck]" and "I'm screaming my head off ryt now[.]"

Approximately a week later, on or about July 23, 2024, an image of a firearm with an extended magazine, *i.e.*, a magazine that can hold more bullets, and what appears to be two additional magazines, was saved to Loadholt's Apple iCloud account:



### E.      Rivera and Loadholt Are Arrested

In the early morning hours of November 7, 2024, Rivera and Loadholt were arrested at their respective residences.  Their apartments were also searched pursuant to search warrants.  At Rivera's residence, law enforcement agents recovered, among other things, a firearm with a partially obliterated serial number.  At Loadholt's residence, law enforcement agents recovered, among other things, approximately 25 rounds of .40 caliber bullets and approximately one round of .45 caliber bullet.

### F.      Rivera's Post-Arrest Interview

Following Rivera's arrest, he was interviewed by law enforcement.  The interview was video recorded.[4]  Food and water were made available to Rivera throughout the interview, and Rivera was also repeatedly offered bathroom breaks.  At the outset, Rivera was verbally read his *Miranda* rights from a form and verbally acknowledged his rights as they were being read.  (File 1, 11:25).  After being read his rights, Rivera was given a copy of the form and signed it.  (File 1, 12:32).  The signed *Miranda* waiver is attached as <u>Exhibit A</u>.  After being advised of his *Miranda* rights and waiving them, Rivera falsely denied ever being at Fairfield University (File 1, 22:20; 25:47), falsely denied conspiring to hurt anyone (File 1, 26:27, 49:29), and falsely denied speaking with anyone outside the United States except occasionally texting a friend in Jamaica on Facebook (File 1, 29:14).  When the interviewing agents advised Rivera that they knew he had been to Fairfield University, Rivera stated: "I think, I don't wanna say nothing else. Im'a exercise my right to remain silent." (File 1, 51:12).  Immediately after saying he wanted to "remain silent," Rivera volunteered an additional statement: "And, um, but I still maintain that I don't know what you're

---

[4] A copy of that video recording, which comprises two video files ("File 1" and "File 2") is being provided to the Court for its *in camera* review, along with a draft transcript.  Relevant portions of the transcript are quoted below.  This memorandum will refer to the recording timestamps corresponding to the events described.

talking about, Fairfield University." (File 1, 51:20.) Rivera did not invoke his right to counsel. The interviewing agents immediately terminated the interview. They advised Rivera that there were still a few things to deal with, such as processing and fingerprinting. (File 1, 51:27).

Approximately 15 minutes later, the agents returned to execute a warrant to search Rivera's cellphone. (File 1, 1:08:25). That warrant, attached as Exhibit B, authorized the search of cellphones seized during the search of Rivera's residence, and further authorized the agents to utilize biometric unlocking by depressing Rivera's finger to the screen for a fingerprint unlock or displaying Rivera's face to the phone camera for a facial recognition unlock. The agents summarized the warrant, provided Rivera with a copy of the warrant to read it, and asked if he would provide his PIN so that they would not have to resort to the biometric unlocking measures authorized by the warrant. Rivera initially refused to give his PIN. (File 1, 1:09:06). The agents then attempted to use the facial recognition unlock, but Rivera said, "no," and turned his face away from the camera. (File 1, 1:09:20.) Although the warrant authorized the agents to use a reasonable degree of force to execute the facial recognition unlock, they read the biometric provisions of the warrant to Rivera, provided him a copy of the warrant to read to himself, and said, "I would like this not to be difficult." (File 1, 1:10:15.) After reading the warrant to himsel, Rivera said, "Alright, so, what do you want?" (File 1, 1:11:21.) The agents said they wanted to unlock Rivera's phone. Rivera motioned for the agents to hand him the phone and entered the PIN, unlocking it. (File 1, 1:11:24). The agents asked Rivera what the PIN was, and Rivera then told the agents the PIN.

When the agents tested the PIN that Rivera provided, it did not unlock the phone. (File 1, 1:11:50.) Rivera acknowledged that he made an error, provided a PIN that unlocked the phone, and demonstrated it by entering it into the phone for the agents to see. (File 1, 1:12:15).

10

Before leaving the room, one of the agents showed Rivera a picture of Shakeri that was saved on the agent's cellphone.  The agent told Rivera, "Just so you don't think I'm lying, you know who that guy is at the bottom?  I do.  The photo I have is much clearer.  Just so you don't think I'm bullshitting."  (File 1, 1:12:51.)  The agents then informed Rivera that he would be fingerprinted and taken to the courthouse to see pretrial services, and both agents departed the room.  They returned a short time later to take Rivera to be fingerprinted and processed (File 1, 1:24:21) and then returned Rivera to the interview room 20 minutes later to wait to be taken to the courthouse. (File 2, 00:01.)

Nearly two hours after unlocking Rivera's cellphone and more than an hour after Rivera had been fingerprinted and processed, one of the agents returned to the interview room to see if Rivera needed water or to use the bathroom.  Rivera asked, "What am I being charged with again?" (File 2, 1:13:22).  The agent left the room to bring Rivera a copy of the arrest warrant so that he could read the charges against him, returning half an hour later with the warrant.  (File 2, 1:43:39).[5] While reading the arrest warrant, Rivera repeatedly engaged the agents with questions about the charges.  Rivera asked, for example, "What's money laundering?"  (File 2, 1:44:39).  One of the agents summarized the charge as concealing or obscuring the source of money.  Rivera then volunteered, "How'd I do that if someone sent it to me?"  (File 2, 1:44:56).

Recognizing that Rivera had voluntarily and spontaneously re-engaged with the agent about the offense conduct, the agent reminded Rivera that he previously had stated he did not want to answer questions: "I'll answer you, but very quickly, when we left last time, you did say you were gonna invoke your right to silence."  (File 2, 1:44:57).  Rivera affirmed, and the agent went

---

[5] When the agents returned with a copy of the arrest warrant, approximately two hours and 20 minutes had elapsed since the termination of the earlier questioning.

11

on to explain: "That's fine. We can talk now if you want to, but I just want to make sure you know that you still have the same rights that [the other agent] read to you beforehand."  The second agents then offered to read Rivera his rights again: "I can re… I can re-read them to you."  Rivera, however, declined: "No, I'm good. I understand."  (File 2, 1:45:14).

Rivera then continued to discuss the money laundering charge, asking: "Conspiracy to commit money laundering. What exactly is that?" and: "How would you hide that? How would I hide that?"  (File 2, 1:45:19).  The agents, still without posing any questions, gave general descriptions of money laundering techniques to obscure or hide the source of funds.  Rivera then said, "Alright. So, it's basically hiding money that's coming in."  At that point—after Rivera had reinitiated the conversation, been reminded of his *Miranda* rights, declined to have the rights re-read to him, reacknowledged that he understood them, and continued the discussion with the agents—one of the agents asked, "Were you in receipt of funds from any place?"  (File 2, 1:46:12). Rivera paused and said, "Um."  The agent elaborated that Rivera would have no need to hide legitimate money that Rivera earned from his construction work.  (File 2, 1:46:35).  Rivera then said, "I haven't been level with you, right?  Think you know that.  Think you know that, um, somebody I know named Muhammad.  Um, I met him in prison."  (File 2, 1:47:00).

Rivera went on to answer questions about his association with "Muhammad," including:

- acknowledging that Muhammad asked him to go to Fairfield University where a woman would be speaking (File 2, 1:48:32);

- claiming that he went to Fairfield alone and using his own car (File 2, 1:51:08);

- admitting that he received approximately $1,000 for doing so (File 2, 1:52:29);

- admitting that the money came from overseas and was sent in someone else's name (File 2, 1:52:47);

12

- admitting that Muhammad asked Rivera to surveil the woman's house (File 2, 2:03:20), though he falsely claimed he went only once (File 2, 2:04:04);

- acknowledging that Muhammad lived outside the United States and spoke Farsi as well as English (File 2, 2:09:16, 2:10:13);

- claiming that Muhammad told Rivera that the woman had run off with $250,00 (File 2, 2:51:20); and

- admitting that Muhammad asked Rivera to kill her (File 2, 2:51:01).

Rivera never mentioned Loadholt and consistently claimed, albeit falsely, that he acted alone.

## ARGUMENT

### I. Rivera's Motion to Suppress His Post-Arrest Statements Should Be Denied

#### A. Applicable Law

A suspect in custody has a Fifth Amendment right to remain silent and to refuse to answer law enforcement's questions. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). "[A]n accused who wants to invoke his or her right to remain silent [must] do so unambiguously;" a statement that is "ambiguous or equivocal" is not sufficient to invoke that right to remain silent. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *see also United States v. Plugh*, 648 F.3d 118, 124 (2d Cir. 2011) ("[T]he *Berghuis* Court made clear that for a defendant successfully to invoke his *Miranda* rights, he must do so through a clear, unambiguous affirmative action or statement."). The standard is objective, not subjective. *See Berghuis*, 560 U.S. at 381 ("A requirement of unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and ... provide[s] guidance to officers' on how to proceed in the face of ambiguity." (quoting *Davis v. United States*, 512 U.S. 452, 458–59 (1994))).

The standard turns on the words that the suspect utters to law enforcement and the acts he undertakes in their presence, not on a post-hoc inquiry into the suspect's intent. *Id*. The cases

13

instruct that the court is not to put a thumb on the scale. A requirement that the authorities cease questioning in the face of an ambiguous statement would not only "requir[e] [police] to make difficult decisions about an accused's unclear intent and face the consequences of suppression 'if they guess wrong,'" *Berghuis*, 560 U.S. at 382 (quoting *Davis*, 512 U.S. at 461), but it would also "transform the *Miranda* safeguards into ... obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." *Michigan v. Mosley*, 423 U.S. 96, 102 (1975).

The *Miranda* rule is a "prophylactic employed to protect against violations of the Self-Incrimination Clause." *United States v. Patane*, 542 U.S. 630, 636 (2004). "Consistent with *Miranda*, all criminal defendants must be apprised of certain rights before a custodial interrogation may begin, including, of course, the right to remain silent and be afforded the assistance of counsel. But once those warnings are properly administered . . . a defendant is left to make his own choice as to how best to proceed." *United States v. Plugh*, 648 F.3d 118, 125 (2d Cir. 2011).

To prove a valid waiver of *Miranda* rights, the Government must show, by a preponderance of the evidence, that the defendant had a full awareness of the rights being waived and the consequences of waiving those rights, and that the defendant relinquished those rights voluntarily. *See Colorado v. Connelly*, 479 U.S. 157, 167-69 (1986); *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (per curium). In other words, the defendant's waiver must be knowing and voluntary. If the Government "establishes that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver." *Berghuis*, 130 S.Ct. at 2253. Similarly, "[i]n general, a suspect who reads, acknowledges, and signs an 'advice of rights' form before making a statement has knowingly and voluntarily waived

14

*Miranda* rights." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014); *see also Plugh*, 648 F.3d at 127-28; *Spencer*, 995 F.2d at 11-12.

A defendant's waiver of his *Miranda* rights is not voluntary within the meaning of the Fifth Amendment only if it is obtained by "'techniques and methods offensive to due process' or other circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 514-15 (1963)). Accordingly, a confession is involuntary only when it results from police misconduct. *Colorado v. Connelly*, 479 U.S. 157, 167-69 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"). In conducting this voluntariness inquiry, courts look to whether the defendant's will was "overborne" by the coercive conduct of law enforcement officers such that his statements cannot be deemed to be the "product of a rational intellect and a free will." *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (internal quotation marks omitted). This assessment requires "a careful evaluation of the totality of all the surrounding circumstances," including (1) "the accused's characteristics," (2) "the conditions of interrogation," and (3) "the conduct of law enforcement officials." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).

Once the suspect has unambiguously elected not to answer questions, that election must be "scrupulously honored." *Mosley*, 423 U.S. at 103 (quoting *Miranda*, 384 U.S. at 479). The authorities must immediately cease the interrogation and wait a sufficient amount of time before reinitiating the interview with a new set of *Miranda* warnings. *See id.* at 105–06; *see also Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir. 1989); *United States v. Dell' Aria*, 811 F Supp. 837, 842-43 (E.D.N.Y. 1993). The *Mosley* court set out a number of factors to consider when determining whether an invocation of Fifth Amendment rights was scrupulously honored,

15

including the amount of time that has passed before law enforcement reinitiated contact, whether a different officer conducted the second interview, where the second interview was conducted, and what was discussed during the second interview. *See Mosley*, 423 U.S. at 104–06.

However, a suspect in custody who has invoked the right to silence may later waive that right by initiating further conversation with law enforcement. *Oregon v. Bradshaw*, 462 U.S. 1039, 1043-46 (1983). Questioning thus may resume if "there is a reasonable basis for inferring that the suspect has voluntarily changed his mind." *United States v. Collins*, 462 F.2d 792, 802 (2d Cir. 1972). Although routine inquiries by a suspect, such as requests for water or to use a telephone, do not amount to initiating conversation, a suspect's questions about the charges against him or asking "What is going to happen to me now?" evince a "willingness and a desire for a generalized discussion about the investigation" and can "reasonably . . . be interpreted by the officer as relating generally to the investigation." *Bradshaw*, 462 U.S. at 1045-46. Law enforcement officers may continue questioning a suspect who "initiate[s] a case-related conversation after previously invoking his right to silence." *Richardson v. Capra*, 2024 WL 2161008, at *3 (2d Cir. May 14, 2024) (summary order); *see also United States v. Oehne*, 698 F.3d 119, 124 (2d Cir. 2012) (assuming, *arguendo*, the defendant invoked his *Miranda* rights, he subsequently waived those rights by "voluntarily initiat[ing] a conversation with the officers on the subject of the investigation").

### B.     Discussion

There is no question that Rivera knowingly and voluntarily waived his *Miranda* rights. As the defense acknowledges, "the Officers informed Mr. Rivera of his rights, including the right to remain silent and the right to counsel, which Mr. Rivera acknowledged." (Rivera Mot. at 6, Rivera Decl. ¶ 3). As the recording reflects, Rivera was verbally read his *Miranda* rights and signed a form confirming that he understood them. (*See* File 1, 11:25, 12:32; Ex. A). Rivera maintains the

same now, attesting that, "At the beginning of the interrogation, the Officers informed me of my rights, including the right to remain silent and the right to counsel.  I acknowledged the rights and signed a form attesting so." (Rivera Decl. ¶ 3).  At no point during the interview did Rivera invoke his right to legal counsel.  The only issue to be resolved, therefore, is whether at some point after acknowledging that he understood and was waiving his *Miranda* rights, Rivera unambiguously invoked his right to remain silent.  The record shows that Rivera made an ambiguous invocation of his right to silence and, regardless, subsequently waived any previously invoked Miranda right by voluntarily initiating a discussion with the officers about the subject matter of the investigation.

After being advised of his *Miranda* rights and waiving them, Rivera answered questions for nearly forty minutes before stating: "I think, I don't wanna say nothing else.  Im'a exercise my right to remain silent." (File 1, 51:12).  That invocation was at best ambiguous, however, because Rivera immediately made another statement about the offense:  "And um, but I still maintain that I don't know what you're talking about, Fairfield University." (File 1, 51:20).  The interviewing agents nonetheless treated Rivera's statement as an invocation, despite its ambiguity.  "Alright. Well, sit tight. We got a few things to deal to deal with.  Alright?" (File 1, 51:27.)

Rivera argues that the interviewing agents created a false impression that Rivera could not stop answering questions by referring to future questioning after they acknowledged Rivera's right to silence and stopping the questioning at that point.  (Rivera Mot. at 7).  One of the questioning agent's statements ("Those are some of the questions that we went through.  There are a few more of 'em that we haven't gone through.  Those are the kind of questions that we're gonna end up asking." (File 1, 51:34)), however, was (i) made in the context of describing the next steps in Rivera's arrest processing, such as fingerprinting, and (ii) was not followed by any further questions.  To the contrary, the agents then asked Rivera if he needed water or a bathroom break

17

and then left the room.  From the circumstances, it is clear that the agents in no way conveyed to Rivera that his right to silence, assuming *arguendo* that it was properly invoked, would not be honored.

Rivera next relies on an interaction between the interviewing agents and Rivera approximately fifteen minutes later.  (Rivera Mot. at 7).  The agents reentered the interview room in order to execute a search warrant for Rivera's cellphone, which authorized the use of biometric data, *i.e.*, using his fingerprint or facial recognition, to unlock his cellphone.  As described above, *supra* 10-11, the interviewing agents explained that the warrant authorized the use of biometric data, gave Rivera a copy of the warrant to review for himself, and gave him the option of providing his PIN as an alternative to exercising the biometric data authorization.  Rather than comply with the officers' request to unlock the cellphone by using facial recognition, Rivera turned his head away from the cellphone camera and said "no."  (File 1, 1:09:20.)

The interviewing agents again explained that the warrant authorized the use of Rivera's biometric data, and Rivera read the warrant to himself.  At that point, Rivera asked for the phone and entered the PIN.  The agents asked Rivera to confirm the PIN, which he did, displaying the phone to the agents as he entered the PIN numbers.  Rivera claims that the "officers tricked him into answering by falsely claiming that the warrant required him to provide them with the PIN" and that "this episode strongly conveyed to Mr. Rivera that his right to remain silent would be overcome rather than honored."  (Rivera Mot. at 7-8.)  This claim, again, is belied by the recording. The agents gave Rivera the option of providing his PIN as an alternative to exercising the biometric data authorization provided in the warrant.  After the phone was unlocked, the agents did not continue questioning or ask Rivera for any additional information.  (File 1, 1:12:51).

18

Rivera's arguments based on his cellphone PIN thus fail for several reasons: first, as described above, Rivera's prior attempt to invoke his right to silence was at best ambiguous; second, Rivera's act of entering his PIN into his phone is not a "statement" for purposes of *Miranda*, *see United States v. Shvartsman*, 722 F. Supp. 3d 276, 320 (S.D.N.Y. 2024) (the government may compel a suspect to turn over an unlocked phone "by entering the passcode themselves") (citing *State v. Valdez*, 552 P. 3d 159, 168 (Utah 2023)), and does not support suppression; third, Rivera's providing his PIN orally to the agents was voluntary in light of the surrounding circumstances, which indicate that he made a choice to provide the PIN rather than cause the agents to enforce the biometric data provisions of the warrant; and, finally, the agents made clear that this was not part of continued questioning by telling Rivera that he would be fingerprinted and taken to court and then leaving the room. [6]

Before leaving the interview room for the second time, one of the interviewing agents showed Rivera a picture of Rivera's co-conspirator, Farhad Shakeri, and told Rivera that the agents knew who Shakeri was. (File 1, 1:12:50). Rivera makes much of this statement, claiming that this

---

[6] Rivera does not challenge the search of his cellphone or seek to suppress its contents. Nor could he: even if there were a violation of *Miranda*, a violation of the prophylactic *Miranda* rule does not require "suppression of the [nontestimonial] physical fruits of the suspect's unwarned but voluntary statements." *Patane*, 542 U.S. at 634, 645 (Kennedy, J., concurring). As the Supreme Court explained in *Patane*, 542 U.S. at 636, "the *Miranda* rule is a prophylactic employed to protect against violations of the Self–Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement. Accordingly, there is no justification for extending the *Miranda* rule to this context." The same holds true for a violation of the prophylactic rule set out in *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), that when the evidence seized is "physical, nontestimonial evidence, an *Edwards* violation itself would not justify suppression." *United States v. Gonzalez-Garcia*, 708 F.3d 682, 687 (5th Cir. 2013). Thus, even if a statement providing a cellphone passcode is made in violation of *Miranda*, the contents of the cellphone itself would not be suppressed so long as the statements were voluntary. *United States v. Ephron*, No. 24 Cr. 418 (MMG), 2025 WL 524027, at *12 (S.D.N.Y. Feb. 18, 2025). In any event, the Government does not anticipate offering Rivera's statement providing his PIN at trial.

19

"conveyed that questioning would continue and that law enforcement would obtain answers from Mr. Rivera notwithstanding his invocation of his right to silence." (Rivera Mot. at 8). This, again, is contradicted by the record. After showing Rivera a photograph of his co-conspirator – demonstrating that the agents were aware that Rivera had lied to them – the exchange ended with the agent telling Rivera to "sit tight," indicating that the exchange was over; and that "we'll see what else we can do, unless you decide," indicating that Rivera controlled the decision. The agents next told Rivera that he would be fingerprinted and taken to court, further indicating that the interview was over.

> Special Agent-2: And just so you don't think I'm lying, you know who that guy is at the bottom? I do.
>
> Rivera: Do you?
>
> Special Agent-2: The photo I have is much clearer.
>
> Rivera: Oh.
>
> Special Agent-2: Just so you don't think I'm bullshitting.
>
> Special Agent-1: Not bullshit.
>
> Special Agent-2: So sit tight. Um, we'll find out what else we can do. Unless you decide.
>
> Special Agent-1: Well, well the next step is we'll take you up to get fingerprinted and everything. Uh, and then [the U.S. Marshal], the guy that was here before . . .
>
> Rivera: Mm-hmm.
>
> Special Agent-1: . . . will take you to cross the street to the courts where you'll get the pretrial services. Phone call, all that stuff.

(File 1, 1:12:51.)

The final instance during the interview when Rivera claims his right to silence was not honored was an interaction initiated by Rivera. Approximately two hours after leaving Rivera, the agents returned, asking Rivera, again, whether he needed to use the restroom or would like water.

20

(File 2, 1:13:22).  Unsolicited, *Rivera asked* for additional information about what he was charged with, to which the agents initially responded by leaving the interview room and returning approximately half an hour later with a copy of the arrest warrant, which Rivera read.  (File 2, 1:43:54).  Again unsolicited, Rivera began asking questions about the charges, including, "That's what the charge is, murder for hire?," "What's money laundering?," and "How'd I do that if someone sent it to me?"  At that point, the agents explicitly reminded Rivera that he previously had said he wanted to remain silent, reminded Rivera of his *Miranda* rights, and offered to re-read those rights.  Rivera declined the offer to have the warnings re-read, stating that he understood his rights:

Special Agent-1:   Uh, so I mean, uh, I'll answer you, uh, but very quickly, when we left last time

Rivera:   Mm-hmm [indicating affirmatively].

Special Agent-1:   You did say that you were gonna invoke your right to silence.

Rivera:   Mm-hmm [indicating affirmatively].

Special Agent-1:   That's fine. We can talk now if you want to, but I just wanna make sure you know that you still have all the same rights that [Special Agent-2] read to you beforehand.

Rivera:   Mm-hmm [indicating affirmatively].

Special Agent-1:   Okay. Um, so go ahead and ask, you can ask.

Special Agent-2:   I can re- I can re-read 'em to you.

Rivera:   No, I'm good. I understand.

Special Agent-1:   Okay. So go ahead and ask your question.

Rivera:   Uh, conspiracy to commit money laundering. What exactly is that?

21

(File 2 1:45:58.)  Only after Rivera was reminded of his previously expressed desire to remain silent, was reminded of his *Miranda* rights, was offered to have those rights re-read, and continued to ask several more case-related questions did the agents ask questions of Rivera.

Rivera's voluntary initiation of case-related discussion, accompanied by a reminder of his Miranda rights and his express acknowledgement that he understood those rights, was a clear waiver of any previously invoked right to silence.  Under these circumstances, the agents reasonably and correctly understood Rivera to be waiving his right to silence, and were permitted to continue questioning.  *Bradshaw*, 462 U.S. at 1045-46; *Richardson*, 2024 WL 2161008, at *3; *Oehne*, 698 F.3d at 124; *Collins*, 462 F.2d at 802.  The agents scrupulously observed Rivera's initial attempt to invoke his right to silence, even though it was ambiguous, and only resumed questioning in response to Rivera's unsolicited re-initiation of a case-related discussion.  The recording makes it abundantly clear that Rivera's responses to the additional questions was voluntary and uncoerced in any way.

For all of these reasons above, Rivera's motion to suppress his post-arrest statements should be denied.

## II.    Loadholt's Motion for Severance Should Be Denied

### A.    Applicable Law

The "preference in the federal system [is] for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993).  Joint trials seek to promote "economy and efficiency and to avoid a multiplicity of trials, [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial." *Bruton v. United States*, 391 U.S. 123, 131 n.6 (1968) (internal quotations and citation omitted).  This preference is "particularly strong" where, as here, "the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998); *United States v. Pirro*,

22

76 F. Supp.2d 478, 483 (S.D.N.Y. 1999) ("[T]he cases are legion that there is a strong public interest in joint trials where . . . the defendants are . . . charged in the same conspiracy.").

A court may nonetheless grant a severance pursuant to Federal Rule of Criminal Procedure 14 "[i]f the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant or the government." *United States v. Van Hise*, No. 12 Cr. 847 (PGG), 2017 WL 3425750, at *45 (S.D.N.Y. Aug. 8, 2017), *aff'd sub nom. United States v. Asch*, 775 F. App'x 15 (2d Cir. 2019), and *aff'd sub nom. United States v. Vanhise*, 797 F. App'x 618 (2d Cir. 2020). In order to prevail on a severance motion, however, a "defendant must show not simply some prejudice but *substantial* prejudice." *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (citation and internal quotation marks omitted). The defendant has the "extremely difficult burden" of showing that he would be so prejudiced by joinder that he would be denied a fair trial. *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989) (internal quotation marks and citation omitted). A district court, therefore, "should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of [a defendant], or prevent the jury from making a reliable judgment about guilt or innocence" and, even in those rare instances where a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539 (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). Accordingly, "the principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa,* 11 F.3d 315, 341 (2d Cir. 1993).

As is relevant here, in *Bruton v. United States,* 391 U.S. 123 (1968), the Supreme Court held that the admission of a non-testifying co-defendant's statements violates the defendant's rights under the confrontation clause of the Sixth Amendment, and severance may be warranted, if the

23

co-defendant's statements are "powerfully incriminating" or "devastating" to the defendant. *Bruton*, 391 U.S. at 135–36; *United States v. Slocum,* 695 F.2d 650, 655 (2d Cir. 1982) ("A *Bruton* violation . . . occurs only when the [codefendant's] statement is both clearly inculpatory of the [co]defendant and vitally important to the prosecution's case." (internal quotation marks and citation omitted)).  The *Bruton* Court further determined that, although generally a limiting instruction to the jury is sufficient to cure any potential for spillover prejudice to the co-defendant, "merely instructing the jury in such cases that the statements are to be considered only against [the defendant] and not against the [co]defendant fails to safeguard adequately the defendant's Sixth Amendment rights."  *Slocum*, 695 F.2d at 655 (citing *Bruton*, 391 U.S. at 135-37)); *Bruton*, 391 U.S. at 137 (noting courts "cannot accept limiting instructions as an adequate substitute for [the co-defendant's] constitutional right to cross-examination").

Even so, in such circumstances, severance is not required.  Instead, a statement can be redacted to resolve *Bruton* concerns.  As this Court has consistently noted, the Second Circuit has approved two types of redactions: "(1) redaction that eliminates all reference to a co-defendant's existence; and (2) redaction that replaces a co-defendant's name with a neutral pronoun such that the statement, standing alone, cannot be understood to refer to the co-defendant."  *Van Hise*, 2013 WL 6877319, at *8–9 (citing *United States v. Jass,* 569 F.3d 47, 56 n. 5 (2d Cir. 2009)); *Marsh*, 481 U.S. at 211 (noting *Bruton* concerns may be addressed through use of a limiting instruction and redaction that "eliminate[s] not only the defendant's name, but any reference to his or her existence"); *United States v. Lyle*, 919 F.3d 716, 733 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 846 (2020) ("A non-obvious redaction of a co-defendant's confession to eliminate any references to the defendant will eliminate any *Bruton* problem. . . . We have consistently held that the introduction of a co-defendant's confession with the defendant's name replaced by a neutral noun or pronoun

does not violate *Bruton*.").  For example, the Second Circuit has previously allowed proper names to be replaced by "another person," *Jass*, 569 F.3d at 59; "my neighbor," *United States v. Yousef*, 327 F.3d 56, 149 (2d Cir. 2003); "this guy," "another guy," and "similar language," *United States v. Williams*, 936 F.2d 698, 699, 701 (2d Cir. 1991); "friend," *United States v. Benitez*, 920 F.2d 1080, 1087 (2d Cir. 1990); and "others," "other people," and "another person," *United States v. Tutino,* 883 F.2d 1125, 1135 (2d Cir. 1989).

When a district court uses redactions involving the use of neutral pronouns, the Second Circuit has instructed that the propriety of the redactions should be considered in light of two inquiries: "(1) did the redacted statement give any 'indication to the jury that the original statement contained actual names,' and (2) did the 'statement standing alone . . . otherwise connect co-defendants to the crime.'"  *Jass,* 569 F.3d at 58 (citing *Tutino,* 883 F.2d at 1135). A court considering the admissibility of a redacted statement that employs neutral pronouns must "view the confession in isolation from the other evidence" in order to insure that "the confession, when so viewed, does not incriminate the defendant." *United States v. Williams,* 936 F.2d 698, 700–01 (2d Cir. 1991).  "If the confession, when so viewed, does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant." *Id.*; *United States v. Wimbley*, 18 F. App'x 24, 27-28 (2d Cir. 2001) ("So long as the confession standing alone is not incriminating, even if the confession taken together with other evidence implicates the defendant, the [redacted] confession may be admitted" with a proper limiting instruction.").

**B.     Discussion**

Loadholt argues that severance is needed "because the introduction of Rivera's post-arrest statement and other incriminating evidence against him [Rivera] at a joint trial would unduly prejudice Loadholt . . . ."  (Loadholt Mot. at 1).  He claims that the "risk of unfair prejudice is

especially acute" because of what Loadholt inaccurately characterizes as "the lack of evidence" of Loadholt's knowledge or involvement in the charged murder-for-hire plot.

Loadholt argues that any limiting instruction applied to Rivera's post-arrest statement would be insufficient to protect his Sixth Amendment rights. (*See* Loadholt Mot. at 6-7). In the same breath, however, Loadholt concedes that, "[a]dmittedly, when Rivera spoke to agents, he did not mention Loadholt by name; in fact, he said that he acted alone." (*Id.*). In fact, Rivera did *not* mention Loadholt by name during his post-arrest interview, severely curtailing Loadholt's arguments that Rivera's post-arrest statement could not be sufficiently anonymized to meet the criteria for admission at a joint trial—it already does, no further redaction or anonymization is necessary. Nevertheless, if the Court deemed it appropriate, a limiting instruction could be fashioned to resolve any possible issue following from the admission of Rivera's post-arrest statement. The Second Circuit has held in similar circumstances that severance is not necessary because limiting instructions and redactions can be used to ensure that no substantial prejudice occurs. *See, e.g.*, *Van Hise*, 2013 WL 6877319, at *8–9; *Lyle*, 919 F.3d at 733; *see also Zafiro*, 506 U.S. at 539 (noting even where "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice").

Forced to admit that inconvenient fact, Loadholt relies on the argument that the Government has "limited evidence" to support its theory that Rivera and Loadholt were working together, along with Shakeri, as part of a plot to murder Victim-1. (*Id.* at 6-7). As a result, Loadholt's argument follows, permitting the Government to admit Rivera's post-arrest statement "and other incriminating evidence" at a joint trial would unfairly prejudice Loadholt. Loadholt argues that the evidence against him is not strong, and therefore he requires severance so he is not

26

prejudice by evidence that would be admitted against Rivera at a joint trial.  Put differently, he argues for a pre-trial acquittal, not severance.

As detailed in the Complaint and summarized above, Rivera and Loadholt are alleged to have participated in a common scheme—the effort to murder Victim-1.  There is, accordingly, a "particularly strong" presumption in favor of joinder.  *See Salameh*, 152 F.3d at 115.  If the Court were to grant Loadholt's severance motion, the Government would need to present duplicative testimony and evidence at two different trials in order to prove the same murder-for-hire conspiracy.  To do so would require a significant waste of judicial resources and result in serious inefficiency.  Loadholt, therefore, must demonstrate that he would be substantially prejudiced if he were jointly tried with Rivera.  *See Sampson*, 385 F.3d at 190.

He plainly cannot meet that heavy burden.  Rivera did not name Loadholt in his post-arrest statement.  Nor can Loadholt's evidence-based argument meet the high standard for joinder. Despite Loadholt's protestations, the evidence of Rivera and Loadholt's joint participation in this conspiracy is manifold, including, among other things, evidence showing (i) Rivera and Loadholt's repeated efforts on multiple occasions over a period of several months to locate Victim-1, in an effort to target her—repeatedly visiting the Brooklyn Residence, following Victim-1 to Fairfield University; (ii) Rivera and Loadholt exercising various operational security measures like swapping license plates on Loadholt's car before approaching the Brooklyn Residence, using burner phones, and turning off or leaving at home their regular phones when looking for Victim-1; (iii) Rivera and Loadholt's explicit communications about payment, including conversations between Shakeri and Rivera that Rivera screenshotted and sent to Loadholt discussing "finishing the work," *i.e.*, killing Victim-1; (iv) Loadholt's express displeasure at not receiving $10,000 up front *before* finishing the work; (v) Rivera's assurances to Shakeri that Loadholt was trustworthy

27

and that Loadholt trusted Shakeri to come through with the money because Loadholt trusted Rivera; (vi) Rivera's description to Shakeri about how he and Loadholt had spent the $3,150 Shakeri sent for travel costs and firearms; (vii) photographs saved to Loadholt's cloud accounts and phones showing that he possessed firearms during the same timeframe that he and Rivera were trying to hunt down Victim-1; and (viii) the recovery of more than two dozen rounds of ammunition recovered from Loadholt's apartment on the day of his arrest.

The defense attempts to wave off this evidence, erecting a strawman argument that Rivera and Loadholt never explicitly wrote "murder" over text and that obtaining a gun and seeking to find Victim-1 could simply have been in furtherance of some other violent targeting, "perhaps a kidnapping or assault." (*Id.* at 6). Loadholt's effort to contort the record seeks to elide the obvious conclusion borne out by the evidence—that Rivera and Loadholt were conspiring together to target and murder Victim-1. Loadholt can make his arguments about the Government's purported lack of evidence and involvement in the conduct to a jury, but, at this stage, cannot argue that unfair prejudice would follow from admitting evidence about his and Rivera's joint criminal activity.

Accordingly, neither the admission of Rivera's post-arrest statement nor of the "other incriminating evidence" of the defendants' joint criminal activity would result in unfair prejudice. The extraordinary remedy of severance is unwarranted here.

## III. The Defendants' Motion to Dismiss the Indictment for Purported Failure to Allege Proper Venue in this District Should Be Denied

### A. Applicable Law

"The dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States* v. *De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted); *see also United States* v. *Walsh*, 194 F.3d 37, 45 (2d Cir. 1999). The law is well-settled that "[a]n indictment returned by a legally constituted and

unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956); *United States* v. *Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998).

"Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . . the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States* v. *Perez*, 575 F.3d 164, 166-67 (2d Cir. 2009) (quotation omitted); *see also United States* v. *Piper*, 2012 WL 4757696 (D. Vt. Oct. 5, 2012). A defendant instead must wait until after the close of the Government's case-in-chief at trial or after the jury's verdict before contesting the sufficiency of the evidence. *See* Fed. R. Crim. P. 29; *see also, e.g.*, *United States* v. *Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997). Where, as here, the defendant challenges the indictment in a pre-trial motion to dismiss, "[a] defendant is limited to challenging whether the indictment meets 'basic pleading requirements and is valid on its face.'" *Piper*, 2012 WL 4757696 at *2 (quoting *Perez*, 575 F.3d at 166); *see United States* v. *Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006) ("In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and, more specifically, *the language used* to charge the crimes." (emphasis in original)); *cf. Perez*, 575 F.3d at 167 (rejecting argument that resolution of legal question does not go to sufficiency of the evidence because "[a] challenge to the sufficiency of the evidence always requires a court to compare the Government's proof against the statutory elements, properly understood" (internal quotation marks omitted)).

An indictment need only contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). In general, to satisfy the pleading requirements, "an indictment need do little more than to track the language of the

29

statute charged and state the time and place (in approximate terms) of the alleged crime." *United States* v. *Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal citation omitted). On a pretrial motion to dismiss, the allegations of the indictment must be taken as true. *See United States* v. *Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

With respect to venue, prior to trial the Government is required to allege only that venue is proper in this District. *See, e.g.*, *United States v. Korolkov*, 870 F. Supp. 60, 63–64 (S.D.N.Y. 1994) (noting where indictment alleges venue, objection to venue is a fact issue properly reserved for trial); *United States v. Rogers*, No. 90-CR-377 (CSH), 1991 WL 90797, at *2–3 (S.D.N.Y. May 21, 1991) (denying a motion to dismiss because the indictment "alleges that the offenses . . . took place in the Southern District of New York, allegations that must be taken as true for the purposes of this motion" and noting that "the defendant is free to revisit this on a motion for acquittal under Rule 29"). "[A]s long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied." *United States v. Stein*, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006).

## B.      Discussion

There is no basis to dismiss Counts Three, Four, and Five of the Indictment (or any Count), which properly allege that charged conduct occurred, at least in part, within the Southern District of New York. Contrary to the defendants' apparent misunderstanding, for each of Counts Three, Four, and Five, the Indictment alleges that the conduct occurred, "in . . . the Southern District of New York and elsewhere," before, *as an alternative basis*, alleging that these offenses were "begun and committed out of the jurisdiction of any particular State or district of the United States[.]" (Indictment ¶¶ 4, 5, 6). The defendants misapprehend the charging language, which alleges *both* that the relevant offenses occurred in this District *and* that venue also could lie in this District were any of the defendants to be first brought to this District, *i.e.*, the application of 18 U.S.C. § 3238

30

were the Government to arrest Shakeri (who committed the offenses abroad, "out of the jurisdiction of any particular State or district of the United States," 18 U.S.C. § 3238) and he be first brought to this District. The law requires nothing more and the Indictment is therefore plainly sufficient to withstand a motion to dismiss.

Indeed, courts in this District routinely refuse to entertain pre-trial motions to dismiss indictments on the grounds urged by the defendant. *See*, *e.g.*, *United States v. Riley*, No. 13 CR. 339 (RPP), 2014 WL 53440, at *3 (S.D.N.Y. Jan. 7, 2014) (denying pre-trial motion to dismiss indictment based on claim of improper venue); *United States v. Fama*, No. S1 95 CR. 840 (RO), 1996 WL 438165, at *1 (S.D.N.Y. Aug. 5, 1996) ("Since the government's burden, at this point, is limited to alleging venue, this motion is properly deferred until the close of the government's case."); *United States v. Szur*, 1998 WL 132942 at *9 (S.D.N.Y. 1998) ("[O]n its face, the Indictment alleges that the offense occurred 'in the Southern District of New York and elsewhere,' which is sufficient to resist a motion to dismiss." (citation omitted)); *United States v. Rogers*, No. 90 Cr. 337 (CSH), 1991 WL 90797, at *3 (S.D.N.Y. May 21, 1991) (finding allegation that offense took place in the Southern District of New York sufficient and pretrial determination of factual basis for allegation premature). Such a venue inquiry is premature. Following the conclusion of the evidence at trial, the defendant may move for acquittal under Rule 29 if he continues to dispute that venue properly lies in the Southern District of New York, as sufficiently charged.

That said, as set forth above and in the Complaint, there is a clear basis for natural venue in this District. While conducting surveillance on Victim-1 in furtherance of their targeting of Victim-1—meaning their attempt to locate and kill her—Rivera and Loadholt, driving Loadholt's car, traveled back-and-forth across the Verrazzano-Narrows Bridge. (*See* Compl. ¶¶ 31(k), (o), (z), (dd)). The Verrazzano-Narrows Bridge passes over a channel of water between Brooklyn and

31

Staten Island that is within the joint jurisdiction of this District and the Eastern District of New York. *See, e.g.*, *United States v. Kirk Tang Yuk*, 885 F.3d 57, 71-72 (2d Cir. 2018) (holding that defendant driving over the Verrazano-Narrows Bridge in furtherance of conspiracy sufficed to establish venue in the Southern District of New York); *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987) (plane *flying* over the Narrows sufficed to establish venue in the Southern District of New York). At trial, the Government expects to offer evidence demonstrating that Rivera and Loadholt crossed the Verrazzano Bridge numerous times in connection with their efforts to carry out the murder-for-hire plot and, thus, in furtherance of the charged conduct. This evidence will include, among other things, license plate reader data, traffic footage, pole camera footage, and cellphone geolocation information.

For all of those reasons, the defendants' motion to dismiss the Indictment for purported failure to allege proper venue in this District is meritless and should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendants' motions in their entirety and without a hearing.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:            /s/
Jacob H. Gutwillig / Michael D. Lockard
Assistant United States Attorneys
Julie B. Isaacson
Special Assistant United States Attorney
(212) 637-2215 / 2193

cc:    Defense Counsel (by ECF)

32