SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE MANHATTAN WEST
NEW YORK, NY 10001
———
TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
212-735-3483
DIRECT FAX
917-777-3483
EMAIL ADDRESS
CHRISTOPHER.GUNTHER@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
ABU DHABI
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SEOUL
SINGAPORE
TOKYO
TORONTO

January 14, 2026

Hon. Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street, Room 701
New York, NY 10007

      **RE:**   **Sentencing Memorandum on Behalf of Carlisle Rivera (USA v. Shakeri et al 1:24-cr-00670-LJL)**

Dear Judge Liman:

  We respectfully submit this letter and the attached exhibits on behalf of our client, Carlisle Rivera, in connection with his upcoming sentencing on January 28, 2026. Mr. Rivera has accepted responsibility for orally agreeing with Farhad Shakeri to commit a homicide in exchange for money. Without minimizing the seriousness of that offense, the context matters. Mr. Rivera did not actually attempt any act of violence, and his actions were generally limited to unsuccessful instances of surveillance to locate the target, for which he was paid approximately $3,600. When Mr. Rivera could not obtain an up-front payment of $10,000 to continue such surveillance, the plan fizzled out several months before his arrest. Mr. Rivera knew nothing about Mr. Shakeri's dealings with the Iranian regime and the prior efforts of the regime to target the victim.

  We respectfully submit that a term of imprisonment of not more than 120 months would satisfy the goals of sentencing. Mr. Rivera has had an extremely difficult childhood and upbringing. He is nearly 51 years old, and the prospect of recidivism upon release is remote at his age. As noted in the Presentence Investigation Report, the average sentence imposed in the past five years for

Hon. Lewis J. Liman
January 14, 2026
Page 2

defendants facing the same Guidelines calculation and Criminal History Category was 126 months. Mr. Rivera promptly accepted responsibility through his guilty plea and has been trying to better himself while incarnated at the Metropolitan Detention Center by complying with all rules and taking advantage of available programs.

I.      **Background**

On October 17, 2025, Mr. Rivera pleaded guilty before Your Honor to conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958, and conspiracy to commit stalking, in violation of 18 U.S.C. § 2261A. Under Section 1958, Mr. Rivera is subject to a statutory maximum term of imprisonment of 10 years. Under Section 2261A, he is subject to statutory maximum term of imprisonment of five years. Pursuant to Mr. Rivera's plea agreement, the parties agree that the advisory Sentencing Guidelines range is 168–210 months' imprisonment, based on a criminal history category of II and an offense level of 34, and that either party may seek a sentence outside the Guidelines range based on the factors set forth in 18 U.S.C. § 3553(a). Because of the statutory maximum term of imprisonment of 180 months, the effective Guidelines range is 168–180 months. The Presentence Investigation Report ("PSR") concurs with this calculation and makes no recommendation as to the appropriate sentence.

As serious and inexcusable as Mr. Rivera's offenses are, aside from surveillance, he took no material steps to committing violence as a part of the conspiracy. Tellingly, seven months passed between the final surveillance and his arrest, during which time the only "overt acts" were a handful of electronic messages between Mr. Rivera and Mr. Shakeri, each initiated by Shakeri. Months passed after the final communication between them before Mr. Rivera was arrested. The conspiracy fizzled out.

Mr. Rivera has taken full responsibility for his actions. He pleaded guilty prior to engaging in substantial litigation, including a suppression hearing on his post-arrest statement, litigation pursuant to the Classified Information Protection Act or trial preparation, any of which would have consumed substantial time and resources of the Government and the Court. He acknowledges his guilt and is committed to improving and being a better person, which he has demonstrated through his behavior while detained at the Metropolitan Detention Center, including his educational and vocational self-development efforts.

Hon. Lewis J. Liman
January 14, 2026
Page 3

## II. Objection to the Presentence Investigation Report

The Guidelines calculation in the Presentence Report matches the agreed-upon Guidelines calculation in the Plea Agreement. Mr. Rivera's only objection to the Presentence Report is that paragraph 102 should be stricken as irrelevant and unsubstantiated. That paragraph details an arrest in South Carolina nearly 30 years ago for which prosecution was declined.

Mr. Rivera would also like to add additional context to paragraph 97, which touches on the "several disciplinary infractions" he committed while previously incarcerated. Any violative behavior described occurred in the first few years of his sentence, and between around 2000 and 2012 he had a clean record with the exception of one minor, nonviolent infraction.

## III. Upbringing and Family

Mr. Rivera was born in Brooklyn, New York, on March 19, 1975, to Albert Debois and Margarita Rivera. PSR ¶ 104. His father lived in Ruffin, South Carolina, and worked as a truck driver. *Id.* He passed away in 2021 from complications related to dementia. *Id.* His mother died of cancer at the age of 35 in 1989. *Id.* His parents separated prior to her death, but they maintained an amicable relationship. *Id.* However, Mr. Rivera recalls instances of physical abuse by his father against his mother. *Id.* Mr. Rivera has one full sibling and eleven half-siblings. *Id.* ¶ 105. Tragically, one of his half siblings with whom he was very close, Clorice Mendez, faced significant mental health challenges and, at the age of 16, took her own life as a result of these struggles. Mr. Rivera was the one to find her body in her room, which was a traumatic experience for him.

Mr. Rivera had a difficult childhood. His mother suffered from alcoholism and relied on public assistance benefits. *Id.* ¶ 106. His father was a "regular presence in his life," but he provided only "minimal financial support." *Id.* On top of the financial struggles, Mr. Rivera endured physical and verbal abuse from his mother, which his father did nothing to stop. *Id.* His mother finally became sober three years prior to her death. *Id.*

Following his mother's passing, Mr. Rivera and his brother moved to South Carolina to live with their father, though Mr. Rivera suspects that his father took custody of them to withhold the majority of the mother's life insurance settlement that was intended for Mr. Rivera and his brother. *Id.* ¶ 107. Mr. Rivera endured physical, verbal, and emotional abuse from his father. *Id.*

Hon. Lewis J. Liman
January 14, 2026
Page 4

In 2014, Mr. Rivera married Margarita Rivera, nee Vega, with whom he had one child, Carlisle Rivera, Jr. ("CJ"), now age 10. *Id.* ¶ 108. Mr. Rivera and Vega separated in 2022, but they have maintained an amicable relationship. *Id.* Prior to his arrest for the instant offense, Mr. Rivera was active in CJ's life and provided voluntary child support of $100 per month. *Id.* Vega describes Mr. Rivera as "the very best father I have seen or known." *See* Letter by Margarita Vega, Ex. A. Mr. Rivera and CJ had been "inseparable": "As CJ started school Carlisle would pick him up everyday [sic] after work, read to him, do math, spelling words, and then take some time to go to the park to play some ball and/or wrestle with him during our evenings." *Id.*

Since Mr. Rivera's arrest, CJ has exhibited signs of depression. PSR ¶ 112. CJ's own letter demonstrates the consequences of Mr. Rivera actions and his arrest:

> My dad is a good person because he used to spend a lot of time with me. He used to pick me up from school every day. He always did homework with me every day and took me to the park. I miss him every day. I want him to come and spend time with me again. Please give him a chance to be better. My life has not been the same without my daddy here. I pray every night he comes home soon. Please make my dream come true.

*See* Letter by Carlisle Rivera Junior, Ex. A.

Mr. Rivera has one other child, now age 32, from a prior relationship, though her mother precluded Mr. Rivera from being actively involved in her life and, thus, they do not have a close relationship. *Id.* ¶ 109.

Since 2023, Mr. Rivera has been in a romantic relationship with Nancy Gomez. *Id.* ¶ 111. Mr. Rivera planned to move in with Ms. Gomez prior to his arrest. *Id.* Ms. Gomez comments that despite the short duration of their relationship, Mr. Rivera has shown "a lot of love towards my 2 daughters" and that he has been in her granddaughter's "life since she was born." She calls him "Papa." Ms. Gomez's daughter echoes this sentiment:

> [Mr. Rivera] has been an incredible father figure in my life in such a short amount of time. He has taken the role of a grandfather to my 2 year old daughter Sevyn. She knows him as Papa. He has been the only devoted male influence in her life […] she asks for him often, looks forward to spending time with him, and finds comfort and joy in his presence.

*See* Letter by Seidy Santiago, Ex. A

    A.    Education and Work

Mr. Rivera attended junior high school in Brooklyn, New York, but after his mother's passing, he moved to South Carolina where he attended high school. PSR ¶¶ 122–23. However, he dropped out after ninth grade as a result of the continuing emotional toll of his mother's death, as well as frustrations with academic performance. *Id.* ¶ 122. He ultimately earned his GED on March 17, 2005, while incarcerated with the New York State Department of Corrections. PSR ¶ 121.

From 2015-2016, Mr. Rivera attended a nine-month fire guard and welding course at Apex Technical School in Long Island City, New York, but he ultimately did not complete the course. *Id.* ¶ 124. From prior employment he had completed OSHA courses and site safety training and acquired licenses in fire guard and air compression testing. *Id.* ¶ 125. Mr. Rivera also had skills and knowledge related to roofing and welding.

Prior to arrest, Mr. Rivera had maintained relatively stable employment. From January 1, 2020, through January 31, 2024, he was employed as a fire suppression technician for Donato Plumbing & Heating. *Id.* ¶ 128. He left that company for a similar role with better pay at TT Mechanical Corp., where he worked until his arrest. *Id.* ¶ 127.

    B.    <u>Criminal History</u>

On February 1, 1994, Mr. Rivera pleaded guilty to murder in the second degree, the sole basis for his Criminal History Category II. Mr. Rivera was 18 years old at the time. He admitted that he and a friend were playing with a handgun when the gun discharged and hit the friend, after which Mr. Rivera intentionally fired three more shots into the friend's body. There was no charge or allegation in that case of premeditation or malicious intent.

Mr. Rivera was sentenced on February 10, 1994, to 15 years to life imprisonment. He was released on parole on November 1, 2012, and discharged therefrom on March 15, 2018. In the twelve years between his release and the arrest for the instant offense, Mr. Rivera had no other criminal charges or convictions.[1]

---

[1]     There was a temporary Order of Protection placed on Mr. Rivera that prohibited him from contacting his estranged wife, Margaria Vega, and their son, but that has ben cleared. PSR ¶ 100.

Hon. Lewis J. Liman
January 14, 2026
Page 6

        C.        Post-Arrest Conduct

Mr. Rivera has been detained at the MDC since his arrest on November 7, 2024. By the time of sentencing, he will have been there for nearly 15 months. During that time, he has had no adverse disciplinary actions. On the contrary, he has endeavored to remain productive and improve himself. To date, he has completed 10 courses and programs and earned two certificates of excellence.[2] He also received a Certificate of Excellence for his services as a Suicide Watch Companion, and he received a Certificate of Achievement for K2 Awareness. Ex. B.

**IV.**       **Sentencing Guidelines**

We agree with the Government and Probation that the total offense level is 34, the criminal history category is II, and the resulting Guidelines range is 168–210 months. Since the statutory maximum term of imprisonment for the two charges, if imposed consecutively, is 180 months, the effective Guidelines range is 168–180 months.

**V.**       **Sentencing Considerations**

Section 3553(a) requires a court to impose a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). As the Court is aware, it must "undertake 'an individualized assessment'" to determine the appropriate sentence, "'based on the facts presented.'" *United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009) (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)). In making this determination, the Court should consider the applicable Guidelines range but must not presume that this sentencing range is reasonable or proper in every case. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Court must "conduct its own independent review of the [§ 3553(a)] factors, aided by the arguments of the prosecution and defense." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*). Among other factors, the Court shall consider (i) the nature and circumstances of the offense; (ii) the defendant's history and characteristics; (iii) the need for the sentence imposed to reflect the seriousness of the offense, to deter criminal conduct, and to protect the public from future crimes; and (iv) the need to

---

[2]   "Sentry Journal (Health Journal)" (Feb. 21, 2025); Business Ethics Course (Mar. 10, 2025); Time Management Course (Mar. 25, 2025); Jump Rope Circuit (Mar. 25, 2025); 10 Soft Skills Course (Apr. 10, 2025); Enjoying Life Sentry Class (June 2, 2025); Feelings Workbook (Oct. 16, 2025); Sales Fundamentals Course (Oct. 27, 2025); Daily Mindfulness Workbooks (Oct. 30, 2025); My Life Skills Workbook (Oct. 30, 2025).

Hon. Lewis J. Liman
January 14, 2026
Page 7

avoid unwarranted sentencing disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(1), (2) & (5).

  A. <u>The Nature and Circumstances of the Offense</u>

  Mr. Rivera's offense conduct was indisputably serious and wrong, for which he has accepted and still accepts full responsibility. Aside from conspiring and communicating with Shakeri and conducting surveillance, Mr. Rivera was never close to completing the object of the conspiracy. Most significantly, seven months passed between the final surveillance (March 31, 2024) and Mr. Rivera's arrest (November 7, 2024). Few messages were exchanged between Mr. Rivera and Mr. Shakeri during those seven months, but the discussions led nowhere. Mr. Rivera tried to obtain an up-front payment of $10,000 from Mr. Shakeri to continue surveillance efforts and became upset when he could not get it. There is no indication that Mr. Rivera intended to take further action. In any event, the last message between the two was sent on July 16, 2024, more than three months before the arrest.[3] In short, the conspiracy had fizzled out.

  B. <u>Mr. Rivera's History and Personal Characteristics</u>

  Mr. Rivera experienced a difficult upbringing marked by various forms of adversity. He recalls witnessing instances of physical abuse inflicted by his father upon his mother. Additionally, Mr. Rivera endured routine physical and verbal mistreatment from his mother, who struggled with alcoholism up until three years prior to her death in 1989. Raised alongside his brother Obed, their mother relied on public assistance to manage essential living expenses. Although Mr. Rivera's parents were separated, his father maintained a regular presence in his life but contributed little financially to support him. He remembers occasions when utilities were disconnected due to unpaid bills. While Mr. Rivera's father was aware of the abuse Mr. Rivera endured by his mother, he never intervened or reported it. Following his mother's passing in 1989, Mr. Rivera and his brother moved to South Carolina to live with their father, where they continued to face emotional, verbal, and physical abuse. Mr. Rivera's challenging upbringing has significantly affected his mental

---

[3]  The Complaint alleged that Shakeri and Mr. Rivera "Discuss the $100,000 Payment to 'Take Care of It Already,'" in July and August 2024, but the only thing that occurred in August was that Shakeri took a screenshot of a video recorded in April and took a screenshot of the victim's social media accounts. Compl. at 20 (quoting the section header) & ¶ 32. Mr. Rivera had no role in this August "conduct."

Hon. Lewis J. Liman
January 14, 2026
Page 8

health; however, he has made commendable efforts to confront these challenges and emerge as a stronger, more resilient individual.

Mr. Rivera maintained a spotless criminal record for the 12 years between his release from prison and the instant offense. During that period, Mr. Rivera statistically was at the highest risk of recidivism. Instead, he reentered society and attempted to be a productive citizen. The Court should consider Mr. Rivera's 12 preceding years of good behavior.

Mr. Rivera's clean record during his detention at the MDC likewise reflects his potential to move forward with a law-abiding future. It is not uncommon for pretrial and pre-sentence inmates to get in trouble for violations like possessing contraband or engaging in misconduct. Mr. Rivera has done nothing but be a cooperative and compliant inmate.

Additionally, Mr. Rivera has no affiliations with criminal organizations or networks. He certainly has no ties to Iran. The Government of Iran may be a central focus for the Government and, understandably so, for the victim, but it has little bearing on the appropriate punishment for Mr. Rivera, who knew nothing about it.

Finally, and discussed further below, Mr. Rivera's age should be an important fact that the Court considers. He will be almost 51 at sentencing. Regardless of the sentence, it is unlikely he will be released from prison before he is nearly 60.

      C.      The Need for the Sentence Imposed

Section 3553(a)(2) instructs the Court to consider the need for the sentence imposed. A 10-year sentence would meet those needs.

Ten years is a lengthy sentence. It reflects the seriousness of and provides just punishment for the crimes and it promotes respect for the law. *See* 18 U.S.C. § 3553(a)(2)(A). No reasonable person would view such a sentence as lenient, especially when the alternative is just a few years extra. As noted in the PSR, the average sentence for similarly situated defendants in the past five years was 126 months. PSR at 38.

A 10-year sentence acts as a strong specific and general deterrent. *See* 18 U.S.C. § 3553(a)(2)(B). A 10-year sentence is the statutory maximum term for his main count of conviction, 18 U.S.C. § 1958. Mr. Rivera will be approximately 60 years old when he is released. He is going to miss much of the human experience—

Hon. Lewis J. Liman
January 14, 2026
Page 9

to be sure, because of his actions—including much of his now 10-year-old son's childhood. Ten years will deter Mr. Rivera from committing future crimes.

Similarly, this sentence will deter others from committing these crimes no less than a slightly higher sentence. No reasonable person would observe Mr. Rivera's 10-year sentence and decide that these offenses are worth it. They certainly would not change that calculus for an alternative 15-year sentence, the statutory maximum available only by stacking both counts of conviction. Moreover, Mr. Rivera has no ties to any criminal organizations, which might otherwise be a basis for general deterrence—such consideration is inapplicable here.

Upon his release, a 60-year-old Mr. Rivera will not be a threat to the public. *See* 18 U.S.C. § 3553(a)(2)(C). Studies, including those by the U.S. Sentencing Commission ("U.S.S.C."), consistently show that recidivism drops drastically at age 60:



U.S.S.C., "The Effects of Aging on Recidivism Among Federal Offenders," at 11 Fig. 1 (2017), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

Moreover, the data shows that Mr. Rivera's offense conduct and criminal history here are not indicators of increased risk of recidivism. "The low recidivism rate of older adults remains consistent *regardless of the nature of a person's criminal*

Hon. Lewis J. Liman
January 14, 2026
Page 10

*conviction*." See N.Y. City Council, Justice in Aging: Aging Population in Jails and Prisons (last visited Oct. 24, 2025), http://council.nyc.gov/data/justice-in-aging (emphasis added). In fact, "[t]he severity of the original conviction offense is not indicative of recidivism risk." Council on Criminal Justice, Recidivism Rates: What You Need to Know (last visited Oct. 24, 2025), http://counciloncj.org/recidivism_report. Furthermore, those "who have served longer sentences for violent crimes return to prison at lower rates than those who serve shorter sentences for nonviolent crimes. Less than 2 percent of people 55+ who served prison time for violent crimes return to prison for new crimes." *See* N.Y. City Council, Justice in Aging: Aging Population in Jails and Prisons (last visited Oct. 24, 2025), http://council.nyc.gov/data/justice-in-aging.

Finally, while Mr. Rivera's crime legally is considered an act of violence, it bears repeating that he did not engage in any violent act. We respectfully submit that Mr. Rivera's threat to the public is minimal now and will only diminish further after a ten-year sentence.

### D.    120 Months is Appropriate Relative to Similarly Situated Defendants

The PSR observes that in the last five fiscal years, there have been three defendants whose primary guideline was Section 2A1.5, with total offense level 34, criminal history category II, and no sentence reduction pursuant to U.S.S.G. Section 5K1.1. PSR Appendix A. Of those three, the average sentence was 126 months, and the median was 132 months. Of course, there is incomplete information about those cases, and every case should be evaluated on its own facts and circumstances. But the defense submits that this should serve as an additional data point that supports the present request for a sentence of no more than 120 months.

### E.    Harsh Conditions at the MDC

By the time of sentencing, Mr. Rivera will have been detained for nearly 15 months at the MDC in Brooklyn, a facility that suffers from well-documented harsh and inhumane conditions. In recent years, the facility has faced widespread criticism for chronic overcrowding, inadequate medical care, and frequent lockdowns that severely restrict inmates' access to bare necessities, including showers, recreation, and legal counsel.[4] Reports from the U.S. Department of Justice Office of Inspector

---

[4]    Alisha Ebrahimji, *What it's like inside the infamous jail where Venezuela's former president Nicolás Maduro is being held*, CNN (Jan. 6, 2026), https://www.cnn.com/2026/01/06/us/metropolitan-detention-center-brooklyn-maduro; Courtney Gross, *Exclusive: Inmates decry conditions inside Brooklyn jail*, SPECTRUM NEWS NY1 (Jun. 24,

Hon. Lewis J. Liman
January 14, 2026
Page 11

General and other organizations have detailed persistent issues such as unsanitary living conditions, power outages, and insufficient mental health services.[5]

The Honorable Jesse M. Furman recently observed that "it has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC." *United States v. Chavez*, 710 F. Supp. 3d 227, 229 (S.D.N.Y. 2024). The Honorable Gary R. Brown of the Eastern District of New York declared that he would vacate the sentence of nine months incarceration for home incarceration if the BOP sent the defendant to MDC, explaining that the conditions at the MDC make a sentence served there "materially different and necessarily disparate from one served elsewhere." *United States v. Colucci*, 743 F. Supp. 3d 452, 462 (E.D.N.Y. 2024).

Of course, Mr. Rivera will not serve the balance of his sentence at MDC, but that doesn't negate the conditions in which he has lived for the past 15 months. In February 2025, while he was there, a violent fight at the facility left over ten people with stab wounds.[6] The MDC locked down and suspended all social visits "until further notice."[7] As a result, Mr. Rivera could not see his family despite his lack of involvement in that fight.

MDC's space and resources were strained further when this past summer over 100 ICE detainees were transferred there. As of November 20, 2025, BOP's

---

   2024), https://ny1.com/nyc/all-boroughs/politics/2024/06/24/brooklyn-federal-jail-murder-conditions.

[5]   *Investigation Regarding a Whistleblower Disclosure that Managers at the Bureau of Prisons, Metropolitan Detention Center, Brooklyn, New York, May Have Engaged in Conduct That Constitutes a Violation of Law, Rule, or Regulation; Gross Management; and a Substantial and Specific Danger to Public Health and Safety*; *Investigation Records Shed Light on Troubling Conditions at Brooklyn Metropolitan Detention Center During 2019 Power Outage*, AMERICAN OVERSIGHT (Feb. 3, 2021), https://americanoversight.org/records-shed-light-on-troubling-conditions-at-brooklyn-metropolitan-detention-center-during-2019-power-outage/.

[6]   Katie Rose Quandt & Maeve Brenan, *Lockdowns, Violence, and "Barbaric Conditions" in a Brooklyn Federal Jail Known for Its Famous Detainees*, SOLITARY WATCH (June 30, 2025), http://solitarywatch.org/2025/06/30/in-a-federal-jail-known-for-its-famous-detainees-hundreds-of-others-face-lockdowns-violence-and-barbaric-conditions.

[7]   Julia Burns, *Metropolitan Detention Center in Brooklyn Suspends Friends and Family Visits Until Further Notice*, NEWS12 WESTCHESTER (Feb. 27, 2025), http://westchester.news12.com/metropolitan-detention-center-in-brooklyn-suspends-visitation-until-further-notice.

Hon. Lewis J. Liman
January 14, 2026
Page 12

website showed the total inmate population at MDC as 1,322,[8] meaning the addition of ICE detainees was at least an 8% increase in population, taxing an already resource-strained facility.

## VI. Conclusion

For the foregoing reasons, we respectfully submit that a sentence of no more than 120 months is sufficient but not greater than necessary to comply with the objectives of § 3553(a).

Respectfully submitted,

*/s/ Christopher J. Gunther*
Christopher J. Gunther

cc (via ECF):
AUSAs Jacob Gutwillig and Michael Lockhard

---

[8] Statistics, Federal Bureau of Prisons (last updated Nov. 20, 2025), http://www.bop.gov/about/statistics/population_statistics.jsp.