UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

              - v. -

CARLISLE RIVERA,
  a/k/a "Pop,"

                  Defendant.

S1 24 Cr. 670 (LJL)


**THE GOVERNMENT'S SENTENCING SUBMISSION**


JAY CLAYTON
United States Attorney
Southern District of New York

Michael D. Lockard
Jacob H. Gutwillig
Assistant United States Attorneys
   *Of counsel*

## TABLE OF CONTENTS

Page

BACKGROUND .................................................................................................................. 2

  I.   The Offense Conduct ............................................................................................... 2

      A.  Shakeri Pays Rivera and Loadholt to Target Victim-1 at Fairfield University ............... 3

      B.  Rivera and Loadholt Stake Out Ms. Alinejad's Former Residence ................................ 6

      C.  Shakeri Prepares $100,000 to Deliver to Rivera if Rivera and Loadholt "Finish the Work" ................................................................................................................. 10

      D.  Shakeri, Rivera, and Loadholt Discuss the $100,000 Payment to "Take Care of It Already" ............................................................................................................. 11

      E.  Rivera and Loadholt Are Arrested ................................................................... 13

      F.  Rivera's Post-Arrest Interview ......................................................................... 14

  II.  The Charges ......................................................................................................... 15

  III.   Rivera's Guilty Plea ............................................................................................ 15

  IV.   The Presentence Report ...................................................................................... 16

DISCUSSION ................................................................................................................... 17

      A.  The Nature and Seriousness of the Offense ...................................................... 17

      B.  The Need to Afford Adequate Deterrence .......................................................... 17

      C.  The History and Characteristics of the Defendant ............................................. 19

      D.  The Defendant's Sentencing Arguments Do Not Support a Variance .......................... 19

      E.  A Sentence of 180 Months Appropriately Reflects Rivera's Culpability ..................... 20

CONCLUSION ................................................................................................................. 22

The Government respectfully submits the memorandum in advance of the sentencing of defendant Carlisle "Pop" Rivera. A sentence of the statutory maximum of 180 months' imprisonment, which is within the parties' stipulated guidelines range (the "Stipulated Guidelines Range"), is necessary and appropriate to reflect the grave seriousness of the offense and to afford adequate deterrence to Rivera and others. Rivera, who previously has been convicted of second-degree murder, agreed to murder again. The target of Rivera's murder plot was Masih Alinejad, a prominent Iranian-American author, journalist, and human rights advocate living in the United States. The Government of Iran has long sought to murder Ms. Alinejad because of her efforts to promote gender equality and civil liberties in Iran and to expose the regime's corruption, oppression, and terrorism to the international community.

In 2024, Rivera was hired by his friend, Farhad Shakeri, to murder Ms. Alinejad. Rivera and Shakeri served time together in the New York prison system after Rivera's 1994 murder conviction and Shakeri's 1991 conviction for manslaughter. In 2024, Shakeri was living in Iran and was an asset for the Government of Iran's Islamic Revolutionary Guard Corps ("IRGC"), a designated foreign terrorist organization. The IRGC is a military and intelligence organization that directly reports to the Supreme Leader of the Islamic Republic and is the Government of Iran's primary instrument for providing financial and lethal aid to proxy terror groups in the Middle East. Among its activities, the IRGC plots and conducts attack operations outside Iran targeting, among others, U.S. citizens residing abroad and in the United States. Ms. Alinejad is one of the IRGC's principal targets. The IRGC and the Government of Iran's intelligence services have tried to kidnap or kill Ms. Alinejad themselves, hired organized crime proxies to do so, and, in 2024, turned to the defendant, a violent criminal in New York City who had a demonstrated ability to murder and was willing to kill a stranger, Ms. Alinejad, in exchange for blood money.

Shakeri offered Rivera $100,000 to locate and kill Ms. Alinejad, and Rivera enthusiastically agreed. Rivera recruited his friend, co-defendant Jonathan Loadholt, to assist him in their deadly plot and, using money sent by Shakeri, Rivera and Loadholt procured a firearm and burner cellphones. The two men spent several months attempting to find and kill Ms. Alinejad, tracking her down at a public speaking event and repeatedly surveilling the Brooklyn house where Shakeri and the IRGC believed she lived. Fortunately, Ms. Alinejad and her family had moved out of the Brooklyn house and Rivera was unable to find and kill her. Rivera and Loadholt were arrested on November 8, 2024.

In short, Rivera is a convicted murderer who was contracted by a long-time criminal associate, Shakeri, who was functioning as an intermediary for a hostile foreign regime, to eliminate one of the regime's principal opponents by killing her in cold blood in New York City— for the price of $100,000. For these reasons, and those discussed more fully below, the Government respectfully submits that the statutory maximum sentence of 180 months' imprisonment is the only appropriate sentence in this case.

## BACKGROUND

### I.    The Offense Conduct

In 2024, Rivera was tasked with murdering Ms. Alinejad by his long-time friend, Shakeri, a former resident of New York with whom Rivera served prison time in the New York State correctional system. Following his prison sentence, Shakeri was deported from the United States and eventually lived in Iran, where the IRGC tasked him to use his international network of criminal associates both to identify targets of interest to the regime and to organize teams to attack those targets. One of the regime's main targets has been and remains Ms. Alinejad.[1]

---

[1] During the time of the murder-for-hire plot against Ms. Alinejad, the IRGC was tasking Shakeri to exploit his network of criminal associates to find attackers targeting other victims, including

Shakeri, Rivera, and Loadholt's efforts to kill Ms. Alinejad followed less than two years after a prior failed attempt on her life by the IRGC. In 2022, the IRGC hired members of the Russian Mob to kill Ms. Alinejad, and one of those plotters—like Rivera and Loadholt—bought a firearm (in that case, an AK-47-style assault rifle) and regularly staked out the house in Brooklyn where Ms. Alinejad lived at the time with her family (the "Brooklyn Residence"), waiting for an opportunity to murder Ms. Alinejad when she exited the house. That plot was disrupted by the FBI and publicly exposed by charges filed in January 2023. Three of the Russian Mob leaders involved in the plot were arrested and later convicted. *See United States v. Amirov et al.*, 22 Cr. 430 (CM). The *Amirov* murder-for-hire plot itself followed thwarted efforts by an Iranian intelligence network in 2020 and 2021 to arrange for Ms. Alinejad's kidnapping from Brooklyn so that she could be brought to Iran for a show trial and, likely, execution. *See United States v. Farahani*, 21 Cr. 430 (RA).

### A.     Shakeri Pays Rivera and Loadholt to Target Victim-1 at Fairfield University

In approximately December 2023 and January 2024, Shakeri paid another criminal associate ("CC-1"), with whom, like Rivera, Shakeri had also spent time in New York State prison, to locate the Brooklyn Residence and surveil it. (PSR ¶ 24).

In February 2024, after obtaining photographs of the Brooklyn Residence[2] from CC-1, Shakeri turned to Rivera to carry out the murder and Rivera, in turn, enlisted his friend Loadholt. (*Id.* ¶¶ 30-32). Shakeri provided the defendants with a picture of Ms. Alinejad and the date and

---

Jewish individuals living in the New York area; Israeli tourists in Sri Lanka; and then-Presidential candidate Donald Trump. (*See* Final Presentence Investigation Report, dated January 14, 2026 ("PSR") ¶ 72). Shakeri in fact had one of his associates identify targets in Sri Lanka and take steps to procure AK-47s to carry out a mass shooting.

[2] The Brooklyn Residence is where Ms. Alinejad and her family lived at the time of the prior plots charged in *Amirov* and *Farahani*, but the family had, unbeknownst to the IRGC, moved out because of the threats to their lives and safety.

time of a public event where Ms. Alinejad was scheduled to speak at Fairfield University in Connecticut on February 15, 2024.  (*Id.* ¶ 30).  Shakeri also sent Rivera approximately $1,000 through Western Union, using payment intermediaries in the United Arab Emirates and elsewhere. (*Id.*).  Loadholt and Rivera exchanged text messages about the assignment throughout the day prior to and the day of the scheduled event.  (*Id.* ¶ 32).  Rivera took screenshots of his messages with Shakeri (showing Shakeri's WhatsApp profile picture and phone number with a foreign country code) and sent them to Loadholt, including messages with the address of the university, the start time of the speaking event, and a Western Union receipt showing Shakeri's transfer (through an intermediary) of $500 to Rivera.  (*Id.* ¶¶ 31-33).

Some of Loadholt and Rivera's communications about targeting Ms. Alinejad at the Fairfield University event, recovered from Loadholt's iPhone (seized during the search of his residence), are below:

| Date/Time (EST) | Sender | Receiver | Message |
|---|---|---|---|
| 2/14/2024 5:55:38 PM | Loadholt | Rivera | U get half now half when u get the addy |
| 2/14/2024 5:55:59 PM | Loadholt | Rivera | Cause u need the gas and toll to get there |
| 2/14/2024 6:19:56 PM | Rivera | Loadholt | **Tomorrow** |
| 2/14/2024 9:18:25 PM | Rivera | Loadholt | **Tomorrow that bread is supposed to come in. If it does we out! I have everything we need….** |
| 2/14/2024 9:19:35 PM | Loadholt | Rivera | *Liked "Tomorrow that bread is supposed to come in. If it …"* |
| 2/15/2024 6:37:20 AM | Rivera | Loadholt | **I got 500 so far….. have to go to western union to pick it up though after I get to the island…. Leaving work early** |
| 2/15/2024 6:37:45 AM | Rivera | Loadholt | **Told Margie we were going to look at a bike for us in ct** |

| Date/Time (EST) | Sender | Receiver | Message |
|---|---|---|---|
| 2/15/2024 10:02:11 !M | Loadholt | Rivera | Yea |
| 2/15/2024 1:25:54 PM | Rivera | Loadholt | **On my way home**<br>**Now bro** |
| 2/15/2024 1:26:01 PM | Rivera | Loadholt | **Please be ready** |
| | | | * * * |
| 2/15/2024 1:28:06 PM | Rivera | Loadholt | **Only takes an hour to get there** |
| 2/15/2024 1:28:34 PM | Rivera | Loadholt | **Hour and 20 min** |
| 2/15/2024 1:28:46 PM | Loadholt | Rivera | Shoot the addy |
| 2/15/2024 1:35:52 PM | Rivera | Loadholt | |
| 2/15/2024 1:37:08 PM | Loadholt | Rivera | Yea we'll get 15$ taste for the ride nigga |
| 2/15/2024 1:37:27 PM | Rivera | Loadholt | **Yes sir** |

Using Loadholt's car, Rivera and Loadholt drove to Fairfield University on February 15, attempting to track Ms. Alinejad. (*E.g.*, *id.* ¶34). The two men took the below-depicted photographs of the Fairfield University grounds, including a photograph that shows Rivera's face, and Rivera sent those pictures to Shakeri. (*Id.* ¶ 35).

  

Ultimately, however, Ms. Alinejad's speaking engagement was cancelled, and Rivera and Loadholt did not successfully track her to Fairfield University.

### B.    Rivera and Loadholt Stake Out Ms. Alinejad's Former Residence

Though Rivera and Loadholt missed Ms. Alinejad at Fairfield University, they continued targeting her, hoping to catch and kill Ms. Alinejad at the Brooklyn Residence. (*See generally id.* ¶¶37-53). In March 2024, Shakeri sent Rivera another approximately $2,600, bringing the total to more than $3,100. (*Id.* ¶ 37). Multiple times that month—including March 3, 17, 23, 25, and 31— Rivera and Loadholt drove Loadholt's car from Staten Island to Brooklyn to stake out the Brooklyn Residence, usually for hours at a time. (*See id.* ¶¶ 38-48). For example, on March 3, Rivera took nearly two dozen pictures of the front of the Brooklyn Residence, including the front door and a car parked in the driveway, and sent several of these to Shakeri. (*Id.* ¶ 38).

6

Rivera and Loadholt used elaborate methods and operational security measures to conceal their activities: they changed out the license plates on Loadholt's car before arriving at the Brooklyn Residence and after leaving it to prevent the stakeout activity from being associated with the two men; they turned off their regular cellphones or left them at home in order to prevent an electronic record of their travels; and they used "burner" cellphones while on their stakeouts so they could communicate with Shakeri.  (*See id.* ¶¶ 38-48).

On March 31, 2024, Rivera and Loadholt exchanged messages about meeting up to go to the Brooklyn Residence; during the exchange, Loadholt texted Rivera: "Ok this phone is going out now," meaning that Loadholt was turning off his primary cellphone, for the likely purpose of preventing the phone's location from being tracked while Loadholt was surveilling what he believed to be Ms. Alinejad's home.  (*Id.* ¶¶ 44, 47).  Rivera and Loadholt then drove to stakeout the Brooklyn Residence.  (*Id.* ¶¶ 47-48).  After arriving at the Brooklyn Residence, where they sat in the car several hours, Rivera and Loadholt exited Loadholt's car only once and walked to a nearby bagel shop for food and coffee.  (*Id.* ¶ 48).  The two men did not give their real names for their orders and paid cash in order to avoid leaving a record of their presence there.  (*Id.* ¶ 48).

Rivera and Loadholt did not see Ms. Alinejad during their stakeouts in March.  In a series of voice notes exchanged between Shakeri and Rivera on March 31, 2024, Rivera and Shakeri aired their respective frustrations.  (*Id*. ¶¶ 51-53).  Shakeri emphasized that Rivera and Loadholt had failed to accomplish the job; Rivera described that he was frustrated with the difficulty of finding Ms. Alinejad and Shakeri's failure to pay the defendants more money up front.  (*Id.*).  The two men discussed how to carry the job out, ruling out a home invasion because of the risks, and agreeing that the job would have to be done while Ms. Alinejad was out in public.  (*Id.*).  For example:

- In a voice note to Shakeri, Rivera stated, among other things, "this bitch is hard to catch, bro. And because she hard to catch, there ain't gonna be no simple pull up, unless there the luck of the draw. Unless there's the luck of the draw." (*Id.* ¶ 51).

- In a voice note from Shakeri to Rivera on April 1, 2024, Shakeri told Rivera that Ms. Alinejad spent most of the time in a study on the third floor and a recording studio on the second floor.[3] Shakeri went on to state, among other things, that "you just gotta have patience and don't, kicking, kick in the door is not an option because that's a fail, that's a fail maneuver. You gotta wait and have patience to catch her either going in the house or coming out, or following her out somewhere and taking care of it. Don't think about going in. In is a suicide move." (*Id.*)

- In a subsequent voice note, Rivera stated, among other things, that "we was here at night time, like 5:30 this morning, there was no fuckin' lights on . . . I already know kickin' in doors only gonna to bring more attention. We already know that, that part. That neighborhood is too quiet for that type of shit. Unless she's on the first floor, and you kick that shit in and then, then, you know, and let's assume you kick it in on the first try." (*Id.* ¶ 52).

- In a subsequent voice note, Rivera stated, "If we can catch her walking through the door, that's something different. Getting' out the car, that's easy. Kickin' the fuckin' door in? That ain't gonna work, bro. That ain't gonna work. Kickin' the door in's not gonna work." (*Id.*).

- In a subsequent voice note, apparently responding to a message from Shakeri, Rivera stated:

  > What I'm sayin' to you in a nutshell, bro, is in order for this to get done? And I don't give a fuck who is [U/I]. You say, "fuck you, nigga, I want somebody else." Ok, your secret safe with me 'cause I ain't no snitch nigga, and I sure ain't no bitch nigga. So I can handle that, right.

Rivera thus assured Shakeri that if Shakeri decided to give the murder-for-hire job to someone else, Rivera would not inform on Shakeri. Rivera continued:

  > By the same token, you not gonna find too many motherfuckers who willing to take the job with receiving next to nothin' to start the job off with. You sent me thirty-one fifty, right? That pays for some tools and fuels, right? Tools and fuels that's being, the slammer, mostly, the slammer. Um, toll bridge fee, going back and forth. Putting gas in the car. Rentin' the car. Look, the car

---

[3] Among other things, Ms. Alinejad recorded a Farsi-language news and satire program for Voice of America, which was sometimes recorded in part from home, as were other videos and interviews broadcast on Ms. Alinejad's social media.

> ain't mine bromie, that shit is bein' rented.  It's funded by the
> thirty-one fifty.  Shit ain't, know what I mean, niggas ain't just
> lettin' you hold their car to do a drive by for nothin', know what
> I mean, so. . . .

Rivera's reference to "money to start the job off with" meant a down payment in advance of

completing the murder.  His reference to "tools," which he also called a "slammer," meant a

firearm.  In this voice note, Rivera informed Shakeri, among other things, that Rivera and Loadholt

had used $3,150 received by Rivera from Shakeri to buy a firearm, to pay travel costs, and to pay

for the use of the car intended to be used in a "drive by," or a drive-by shooting.

> But homie, how long you think that's gonna last?  How long can you
> expect two workin' niggas, or one workin' nigga, really me, but my
> man too, he a workin' nigga too.  He not like, he's gonna sit out here
> all night, all day, rain, cold, sleet, on a promise.  Let's be for real,
> we out here on a promise, from a nigga I know.  Not even a nigga
> he knows, a nigga I know.  But the less he knows, the better off you
> are.  The less you know, the better off he is.  Only thing y'all knew
> each other is through me.
>
> So, how far, realistically speaking, how far can a, will a nigga move,
> or how much will a nigga move on a promise?  Niggas be like nah,
> I don't give a fuck how I know you, nah I ain't riskin' that.  And he
> ask me, he said yo, how you feel about, how I feel about you.  I say
> "yo, he's always been good people with me.  He's always had good
> character to me. . . .  If it was anybody else I'd say get the fuck out
> my face.  Because it's him, and I know it's him, I'm tempted to
> believe him.  I'm willing to give it a try for him."

(*Id.* ¶ 52).  Rivera thus informed Shakeri that Rivera and Loadholt were willing to carry out the

murder, including conducting the repeated, lengthy stakeouts of the Brooklyn Residence that had

been required, without a larger up-front payment because of Rivera's trust in Shakeri.  Rivera

described having persuaded Loadholt based on Rivera's vouching for Shakeri, even though Rivera

did not reveal either man's identity to the other in order to protect each of them.

### C.    Shakeri Prepares $100,000 to Deliver to Rivera if Rivera and Loadholt "Finish the Work"

Several days after these exchanges of voicemails, Rivera viewed electronic images of Iran's Supreme Leader, the Ayatollah Ali Khamenei.  The images are saved as thumbnails, indicating Rivera viewed them in an electronic messaging chat, and have file dates of April 12 and 13, 2024. The investigation has uncovered no evidence of Rivera viewing similar photographs or conducting Internet searches related to Khamenei before these dates.

 

A few days later, on April 19, 2024, Shakeri and Rivera discussed an additional payment of approximately $100,000 for Rivera and Loadholt to "finish the work."  (*Id.* ¶ 54).  On that date, Rivera messaged Shakeri to ask, "Are we still on? Is that a green light?"  Shakeri later messaged Rivera that "I haven't talked to my man, I'm still travelling[.] The 100k is still there[.]"  (*Id.* ¶ 55).

Rivera and Shakeri then exchanged a series of messages about arranging Rivera's collection of the $100,000.  On April 19, 2024, after Shakeri told Rivera that the $100,00 was still there, Rivera responded that "I don't even have that dollar bill I sent u the pick of[.]"[4]  (*Id.*). Shakeri then asked Rivera to send "another bill" on the "the other math," using "math" as slang for a phone number.  (Shakeri, like Loadholt and Rivera, used multiple phone numbers).  Neither Shakeri nor Rivera had cash on them, however, so Rivera sent a photograph of a book showing the ISBN number and asked Shakeri to use that number.  (*Id.*).

---

[4] Rivera took a picture of a $1 bill on March 15, 2024, which was apparently intended to be used to receive a bulk cash delivery.  The serial number of a dollar bill is frequently used for authentication in money laundering transactions or bulk cash deliveries to ensure that the intended person receives the money.  The person delivering the money receives the serial number, and will only release the money to the person who has the bill with that serial number.

Shakeri confirmed the ISBN number, and then told Rivera to "Finish the work, and pick up[.]" Rivera answered, "Nigga I wish it was that easy but I ain't no quitter[.]" (*Id.* ¶ 56). Shakeri later received a video of the Brooklyn Residence from "CR"—Carlisle Rivera—dated April 28, 2024, at approximately 6:11 p.m., confirming that Rivera and Loadholt returned to the house that day to attempt to kill Ms. Alinejad. (*Id.*).

The data recovered from Loadholt's burner phone includes a video, dated April 28, 2024, of the front of the Brooklyn Residence taken from inside a car (dirt on the car window through which the video was taken can be seen, and the car's doorframe appears in portions of the video), showing that Loadholt and Rivera continued staking out the Brooklyn Residence. (*Id.* ¶ 58). The video is sideways and crooked, consistent with the person taking the video attempting to hide the fact that he was filming the house, and at various points zooms in on the car parked in the driveway and on the front door and porch. (*Id.*).



### D. Shakeri, Rivera, and Loadholt Discuss the $100,000 Payment to "Take Care of It Already"

By July, Shakeri again discussed the payment of $100,000 for Rivera to "take care of it already." Rivera pressed Shakeri for the payment, writing, "What are we doing nigga? Waiting

11

on u[.]"  Shakeri responded that he had "just renewed the 100K," referencing the $100,000 Shakeri had previously offered Rivera to "finish the work," meaning to kill Ms. Alinejad.  Shakeri then explained that he had "Been traveling" and his "schedule is hectic," before sending Rivera an apparently close-range image of Ms. Alinejad in workout attire lifting weights in a gym.  He followed up, writing to Rivera, "Short was at the Gym today[,] In the city[.]  I wish you can take care of it already," and "Just do it son, I'll handle the rest."  (*See id.* ¶¶ 59-60).

 

After these communications between Shakeri and Rivera, on or about July 16, 2024, at approximately 2:59 a.m., Rivera sent Loadholt two screenshots, containing the text message conversations between Rivera and Shakeri.  The two then discussed between themselves payment for the murder plot.  Immediately after sending the text message screenshots, Rivera asked Loadholt, "Got it?"  After seeking additional clarification, Loadholt asked, "So no 10 up front I'm guessing??" conveying his understanding that the two would not receive $10,000 up front to

complete the job.  Loadholt then expressed his dissatisfaction about not being paid, writing, "Yo wtf [what the fuck]" and "I'm screaming my head off ryt now[.]"  (*Id.* ¶ 61).

### E.    Rivera and Loadholt Are Arrested

In the early morning hours of November 7, 2024, Rivera and Loadholt were arrested at their respective residences.  Their apartments were also searched pursuant to search warrants.  At Rivera's residence, law enforcement agents recovered, among other things, a firearm with a partially obliterated serial number, which is depicted below.  (PSR ¶76).



At Loadholt's residence, law enforcement agents recovered, among other things, approximately 25 rounds of .40 caliber bullets and approximately one round of .45 caliber bullet, some of which are shown in the photograph below.  (*Id.*).



### F.    Rivera's Post-Arrest Interview

Following Rivera's arrest, he was interviewed by law enforcement.  At the outset of the interview, Rivera falsely denied ever being at Fairfield University, falsely denied conspiring to hurt anyone, and falsely denied speaking with anyone outside the United States except occasionally texting a friend in Jamaica on Facebook.  Later in the interview, one of the agents showed Rivera a picture of Shakeri from the agent's cellphone, telling Rivera, "Just so you don't think I'm lying, you know who that guy is at the bottom?  I do.  The photo I have is much clearer.  Just so you don't think I'm bullshitting."

Later, while waiting to be taken for fingerprinting, Rivera asked the agents about the charges against him.  Reading from the arrest warrant, Rivera asked what money laundering meant.  One of the agents summarized the charge as concealing or obscuring the source of money.  Rivera then volunteered, "How'd I do that if someone sent it to me?" and "How would you hide that?  How would I hide that?"  After being asked if he had received money from somewhere, Rivera said, "I haven't been level with you, right?  Think you know that.  Think you know that, um, somebody I know named Muhammad," referring to Shakeri.  "Um, I met him in prison."

Rivera went on to answer questions about his association with "Muhammad," including:

- acknowledging that Muhammad asked him to go to Fairfield University where a woman would be speaking;

- falsely claiming that he went to Fairfield alone and using his own car;

- admitting that he received approximately $1,000 for doing so;

- admitting that the money came from overseas and was sent in someone else's name;

- admitting that Muhammad asked Rivera to surveil the woman's house, though he falsely claimed he went only once;

- acknowledging that Muhammad lived outside the United States and spoke Farsi as well as English;

14

- falsely claiming that Muhammad told Rivera that the woman had run off with $250,00; and

- admitting that Muhammad asked Rivera to kill the woman.

Rivera never mentioned Loadholt and consistently claimed, falsely, that he acted alone.

## II.    The Charges

On November 8, 2024, a Complaint was filed charging Rivera and Loadholt with murder for hire, conspiring to commit murder for hire, and conspiring to commit money laundering. Shakeri was charged with those offenses, as well as providing and conspiring to provide material support to a designated foreign terrorist organization, the IRGC.

On December 5, 2024, an indictment was filed charging the same offenses as the Complaint.

## III.    Rivera's Guilty Plea

On October 17, 2025, Rivera pled guilty, pursuant to a plea agreement, to a two-count Superseding Information.  Count One charges Rivera with conspiracy to commit murder for hire in violation of 18 U.S.C. § 1958, the same offense charged in Count Three of the Indictment. Count Two charges Rivera with conspiracy to commit stalking in violation of 18 U.S.C. §§ 371 and 2261A(2).  Counts One and Two have a total statutory maximum term of imprisonment of 180 months' imprisonment.

Pursuant to the plea agreement, Rivera stipulated that Guidelines Section 2A1.5 applies because the object of the conspiracy was the murder of Ms. Alinejad.  (Plea Agmt. at 3).  The base offense level under Section 2A1.5 is 33.  Four levels are added because the offense involved the offer or receipt of money for undertaking the murder.  (*Id*.)  Assuming the defendant continues to demonstrate acceptance of responsibility, the offense level will be reduced by three levels, resulting in a total offense level of 34.

15

Rivera has three criminal history points and is in criminal history category II, resulting from his 1994 conviction in Kings County Supreme Court for murder in the second degree, for which he was sentenced to a term of imprisonment of 15 years to life. (*Id.*; *see also* PSR ¶¶ 97-98.) That conviction stems from a murder on December 15, 1993, during which Rivera shot another man in Brooklyn several times, mortally wounding his victim, who died the following day. (*Id.*) Rivera was arrested approximately a month later in possession of a loaded firearm. (*Id.*) After almost nine years in custody, Rivera was paroled on November 1, 2012, and discharged from parole on March 15, 2018. Rivera had numerous disciplinary infractions while incarcerated, including fighting, possessing a weapon, smuggling, and counterfeiting. (*Id.*) It was also during his time in New York state custody that Rivera met and befriended Shakeri. (*Id.* ¶ 23).

Based on a total offense level of 34 and a criminal history category of II, Rivera's Guidelines sentencing range would be 168 to 210 months' imprisonment. Because the statutory maximum term of imprisonment is 180 months, Rivera's Stipulated Guidelines Range is 168 to 180 months' imprisonment. (Plea Agmt. at 3.) The stipulated fine range is $35,000 to $350,000. (*Id.*)

## IV.     The Presentence Report

Probation issued the PSR, which agrees with the Guidelines calculation set forth in the Plea Agreement. (PSR ¶¶ 82-99, 139).

Probation recommends a below-Guidelines sentence of 120 months' imprisonment. (*Id.* at 43). Probation recognizes that "the need for adequate punishment and deterrence is paramount" and that Rivera's prior conviction for second-degree murder did not deter him from joining this murder-for-hire conspiracy within approximately six years of his discharge from parole (*id.* at 45), but reasons that Rivera's difficult childhood is a mitigating factor that warrants its recommended sentence. (*Id.*; *see also* ¶ 107).

16

## DISCUSSION

A sentence of 180 months' imprisonment is appropriate to reflect the nature and seriousness of the offenses, to account for the history and characteristics of the defendant, to provide just punishment, and to afford both specific and general deterrence. *See* 18 U.S.C. § 3553(a). Such a sentence would appropriately account for the defendant's role in the offenses and his relative culpability, and the defendant's arguments to the contrary should be rejected.

### A. The Nature and Seriousness of the Offense

The seriousness of the offenses amply supports a within-Guidelines sentence of 180 months' imprisonment. The offense conduct is among the most serious of crimes. *See* 18 U.S.C. § 3553(a)(2)(A). Rivera agreed to murder someone he did not know for money. That someone, Ms. Alinejad, is an author, journalist, and human rights advocate who plays a prominent and critical role in the Iranian populace's struggle for civil rights, for basic political freedoms, and for liberty from a tyrannical theocratic dictatorship that oppresses its citizens with arbitrary arrests and detention, torture, beatings, and gunfire. Rivera may well have had some notion of the significance of Ms. Alinejad as a target: Rivera knew his friend Shakeri was in Iran, he would have known that wealth and power stood behind the promise of a $100,000 payment, and he viewed images of the Supreme Leader during the time of the murder plot. But even if Rivera was completely ignorant that he was working ultimately for the Government of Iran to silence a critic for exercising her freedoms of speech and political activity, there is no indication it would have mattered to him. Rivera's goal was to kill his victim for money.

### B. The Need to Afford Adequate Deterrence

The geopolitical backdrop of the Government of Iran's continued targeting of Ms. Alinejad as part of its campaign of brutally stamping out dissent in Iran and abroad, however, highlights the strong need for deterrence, regardless of the extent to which Rivera was or was not aware of this

17

context.  This murder-for-hire plot represents the third time in approximately five years that the Iranian regime has attempted to silence Ms. Alinejad on American soil.  The regime initiated the *Amirov* murder plot even though the *Farahani* kidnapping plot had been disrupted and publicly exposed through charges filed in this District.  Then, even after the *Amirov* plot was similarly thwarted through arrests, extraditions, and public charges, the IRGC switched criminal networks and pressed ahead through Shakeri.

In certain respects, Rivera's participation in this plot represents an exceedingly dangerous evolution of the threat to Ms. Alinejad, as well as to other dissidents and opponents of the Iranian regime.  In *Farahani*, members of an Iranian intelligence network directly contacted New York private investigators under false pretenses to obtain surveillance and intelligence on Ms. Alinejad in furtherance of the kidnapping plot; in *Amirov*, the IRGC introduced an intermediary, removing itself by one degree, and hired an organized criminal proxy group, the Russian Mob, to do their dirty work; here, the IRGC used a criminal network of American citizens to try to find and kill Ms. Alinejad, greatly increasing the IRGC's ability to operate inside the United States and to hide the IRGC's fingerprints on the murder plot.  By using criminal networks inside other countries through connected criminals like Shakeri and his associates, including Rivera, the IRGC is able to promote violence against its priority targets, like Ms. Alinejad, and also seek out other targets of opportunity, like the Shakeri network's targeting of Jewish businessmen and Israeli tourists.  A strong sentence is needed here to send the message to criminal networks—and to individual criminals, like Rivera—that working with the Iranian regime is a path to a lengthy incarceration. *See* 18 U.S.C. § 3553(a)(2)(B).

### C. The History and Characteristics of the Defendant

Rivera's history and characteristics further demonstrate the need for a 180-month sentence. This is Rivera's second conviction for either committing or attempting to commit murder. Rivera already was convicted for second-degree murder in 1994 arising out of his shooting another man in Brooklyn in 1993. Rivera was sentenced to 15 years to life in that case, which resulted in his serving more than 18 years in the New York State prison system. That sentence and period of incarceration did not dissuade Rivera from agreeing to kill again; to the contrary, he met Shakeri, his eventual co-conspirator in this case, while serving his term of imprisonment. Indeed, Rivera's methods grew more sophisticated: this time, Rivera used a burner phone; he used techniques to avoid detection and surveillance, such as turning his regular cellphone off and switching out the license plates on Loadholt's car during their stakeouts; he bought a firearm with an obliterated serial number to avoid tracing; and he strategized how to carry out the murder in a way that would minimize his chances of getting caught and maximize his chances of escape. The explicit nature of his contemporaneous communications about the plot—such as his voice notes, discussed *supra*—leave little doubt as to his intention to kill Ms. Alinejad.

In short, Rivera, already a convicted murderer who had served a lengthy prison sentence, agreed to kill a stranger for $100,000. His personal history and characteristics further support a sentence of 180 months' imprisonment.

### D. The Defendant's Sentencing Arguments Do Not Support a Variance

The defendant's arguments fall far short of justifying the below-Guidelines sentence he seeks. Rivera, like Probation, points to his difficult childhood as a mitigating circumstance warranting a lesser sentence. (Rivera Sent. Mem. at 7-8.) As sympathetic as his childhood circumstances may have been, however, they are no excuse for twice attempting to commit murder, once successfully. Moreover, Rivera committed this crime of murder-for-hire at the age of 49,

long past the age where he can diminish his responsibility for his own actions.  Nor does his upbringing have any bearing on his agency and ability to decide whether to murder a stranger for money.  In short, Rivera's background is not mitigating under the circumstances of this offense. The fact that Rivera agreed to engage in murder-for-hire well into his middle age, and after a prior murder conviction, also demonstrates the inapplicability of recidivism statistics based on age.  (*See id*. at 11-12).  Rivera has proven that he is not the average case, and it would not serve the legitimate purposes of sentencing to treat him as though he were.

Rivera also relies on the fact that his plot was unsuccessful.  (*Id*. at 7.)  That, however, is no credit to Rivera, who engaged in a sustained course of preparation, planning, and surveillance with every intention to murder Ms. Alinejad.  Rivera's explicit communications, with both Loadholt and Shakeri, make clear he intended to murder Ms. Alinejad.  For example, Rivera alternately discussed how he could "finish the work," the merits of "kickin' the fuckin' door in" to kill Ms. Alinejad, and the "slammer" he would use to do it.  (PSR ¶ 52).  Rivera was unsuccessful only because he lacked opportunity: Ms. Alinejad's speaking engagement at Fairfield University was cancelled; they staked out the wrong house; and, ultimately and thankfully, they were caught before they could kill her.  In any event, the Stipulated Guidelines Range already reflects the fact that the murder-for-hire plot did not reach completion.  If Rivera had succeeded, he would be instead facing a mandatory minimum sentence of life imprisonment under § 1958(a).

### E.    A Sentence of 180 Months Appropriately Reflects Rivera's Culpability

Finally, a sentence of 180 months' imprisonment would appropriately reflect Rivera's culpability as the would-be triggerman in this IRGC-directed plot to kill Ms. Alinejad.  As a point of comparison, Rafat Amirov and Polad Omarov, the Russian Mob leaders who directed the 2022 murder-for-hire plot against Ms. Alinejad, each were sentenced to a term of 25 years' imprisonment by the Honorable Colleen McMahon, following their convictions at trial in March 2025.  In the

sentencing decision accompanying her imposition of sentence, Judge McMahon observed that, "It is highly relevant that the defendants could be and were motivated by money . . . to kill another human being." *See* 22 Cr. 438 (CM), Dkt. 163 at 9). Judge McMahon further stated that the defendants, both foreign citizens, "were agents of a foreign power conspired to commit, and tried to commit, and almost succeeded in committing, a murder inside the United States—where, presumably, an American citizen like Ms. Alinejad should be safe in her own home." (*Id.*). Judge McMahon then concluded that, "a lengthy sentence is needed in this case to punish the defendants for their extremely serious crime and to send a message to other criminal gangs and other foreign powers that this sort of conduct will not be tolerated by the United States." (*Id.*).

So too here. The Government recognizes that a sentence lesser than that imposed on Amirov and Omarov, both foreign citizens who were leaders in a violent faction of the Russian Mob, is appropriate; Rivera is not a leader in an extensive, worldwide, violent criminal organization, and he was not working directly with the IRGC and its intelligence agents. That proportionality is reflected in Rivera's plea offer, which provides a maximum sentence of 180 months' imprisonment. The Government respectfully urges that this statutory maximum is the appropriate sentence in this case to reflect the grave seriousness of the offense, Rivera's significant role in that offense, and his prior conviction for murder.

**CONCLUSION**

For the foregoing reason, the Government respectfully requests that the Court sentence

Rivera to a term of imprisonment of 180 months.

Dated:  January 21, 2026
        New York, New York

                                        JAY CLAYTON
                                        United States Attorney


                                By: _____/s/_____
                                        Jacob H. Gutwillig
                                        Michael D. Lockard
                                        Assistant United States Attorneys